**ROQUETTE FRERES and Roquette Corporation, Plaintiffs,**

v.

**The UNITED STATES, Defendant,**

and

**Phizer, Inc., Intervenor.**

**Court No. 82–5–00636.**

United States Court of International Trade.

March 19, 1984.

---

**600**

Wald, Harkrader & Ross, Washington, D.C. (Joel E. Hoffman, Mark R. Joelson, Marilyn E. Kerst, Mark B. Stern, and Kenneth H. Hall, Washington, D.C., on the briefs), for plaintiffs.

Richard K. Willard, Acting Asst. Atty. Gen., Washington, D.C. (David M. Cohen, Director, Commercial Litigation Branch and A. David Lafer, Washington, D.C., on the briefs), for defendant.

Barnes, Richardson & Colburn, New York City (E. Thomas Honey, Michael A. Johnson, and James H. Lundquist, New York City, on the briefs), for intervenor.

BOE, Judge:

The above entitled action is before the court pursuant to Rule 56.1 cross motions by plaintiffs, Roquette Freres and Roquette Corporation ("Roquette"), and intervenor, Phizer, Inc., each challenging in part the administrative determinations upon the agency record.[1] Plaintiffs challenge the final affirmative determination of the International Trade Administration ("ITA") with respect to sales at less than fair value of sorbitol from France, and the final affirmative determination of the International Trade Commission ("ITC") on remand of material injury to an industry in the United States by reason of imports of crystalline sorbitol from France. Intervenor contests the ITC's final negative determination on

remand of no material injury to the liquid sorbitol industry in the United States.

The pertinent facts are as follows. On June 15, 1981, Phizer filed a petition with the ITA alleging that Roquette was selling sorbitol in the United States at less than fair value and that the sales were causing material injury to the domestic industry. Pursuant to 19 U.S.C. § 1673d, the ITA determined that Roquette was selling sorbitol at less than fair value and published its final affirmative determination. *Sorbitol From France; Final Determination of Sales at Less than Fair Value*, 47 Fed. Reg. 6459 (February 12, 1982). The ITC, in accordance with 19 U.S.C. § 1673d(b), subsequently determined that an industry in the United States was materially injured by reason of imports of both crystalline and liquid sorbitol from France. *Sorbitol From France;* Inv. No. 731–TA–44 (Final), 47 Fed.Reg. 14981 (April 7, 1982). After setting dumping margins for liquid and crystalline sorbitol, the ITA published its final antidumping duty order. *Sorbitol From France; Antidumping Duty Order*, 47 Fed.Reg. 15391 (1982).

Roquette filed a summons challenging the antidumping duty order on May 7, 1982. The court granted Phizer's motion for intervention on July 30, 1982. The defendant moved to suspend all further proceedings and to remand the action to the ITC on the basis "that substantial questionnaire information relevant to the Commission's determination had not been presented to the Commissioners in the Commission's staff report or during the course of the investigation."

The court in granting the defendant's motion directed the ITC:

> to consider in full all relevant information presently in its possession or which hereafter may be presented to it as to

---

**1.** For other court opinions in this action, see *Roquette Freres v. United States,* 7 CIT ——, Slip Op. 84–11 (February 17, 1984) (Memorandum Opinion and Order Denying Plaintiffs' Motion to Dismiss Intervenor's Counterclaim); *Roquette Freres v. United States,* 6 CIT ——, Slip Op. 83–137 (December 21, 1983) (Memorandum Opin-

ion and Order on Cross-Motion to Dismiss); *Roquette Freres v. United States,* 6 CIT ——, Slip Op. 83–71 (July 18, 1983) (Memorandum Opinion and Order to Remand), *Roquette Freres v. United States,* 4 CIT 239, 554 F.Supp. 1246 (1982); *Roquette Freres v. United States,* 4 CIT 128 (1982).

whether an industry was materially injured by reason of imported sorbitol from France being sold at less than fair value [and further ordered] [t]he determination so made by the Commission shall be returned to this court within a period of sixty (60) days from the date of entry of this order.

6 CIT ——, Slip Op. 83–71 (1983).

On the basis of data obtained in the prior as well as remand investigation, the Commission determined that sorbitol imports from France constituted two like products affecting two domestic industries. For purposes of analysis, the Commission on remand obtained separate additional data, not available to the Commission at the time of its original determination, for crystalline and liquid sorbitol on profitability, capacity, capacity utilization, employment, and exports.

In evaluating the data for each product, the Commission found that liquid and crystalline sorbitol imports had different effects on the two respective domestic industries. The ITC concluded that declines in production, commercial shipments, and the market share of domestic crystalline sorbitol evidenced material injury to that industry. As to liquid sorbitol, however, the ITC determined that increased United States production and commercial shipments in the first eleven months of 1981 indicated a healthy domestic industry.

### ITA Determination

In its final determination that liquid and crystalline sorbitol from France were being, or likely to be, sold in the United States at less than fair value, the ITA denied a claimed adjustment to the United States purchase price, which Roquette alleged would have eliminated the entire dumping margin assessed on imports of liquid and crystalline sorbitol.

■ Roquette predicates its claim for an adjustment to the purchase price on 19 U.S.C. § 1677a(d)(1)(B). This statute provides for an adjustment to the purchase price of the imported product by an increase equivalent to:

the amount of any import duties imposed by the country of exportation which have been rebated, or which have not been collected, *by reason of the exportation of the merchandise* to the United States.

*Id.* (emphasis added).[2] It is undisputed that Roquette imported large quantities of United States corn upon which it paid import levies and that Roquette received an export refund based on the corn content of the exported sorbitol product. *See* 18 O.J. Eur.Comm. (No. L 281) 1,2,7 (1975); 23 O.J.Eur.Comm. (No. L 323) 27 (1980).

The ITA, however, denied the price adjustment, determining that:

1. the "import levy" and the "export" restitution payments are not directly linked to, or dependent upon, one another within the context of EC regulations.

2. The exporters may receive these payments regardless of whether or not they imported corn and paid the "import levy."

Roquette contends that under § 1677a(d)(1)(B) the ITA must make its determination on a "case by case" basis without regard to the nature and function of the EC import-export program. The court is unable to agree with the plaintiff. Analysis of the EC regulations reveals that agricultural products may enter the EC under one of two possible processing procedures. Roquette chose not to avail itself of the inward processing arrangement, which provides for the exemption from agricultural levies on imported goods intended for

---

**2.** This statute comports with Article VI(4) of the General Agreement on Tariffs and Trade, which states:

No product of the territory of any contracting party imported into the territory of any other contracting party shall be subject to antidumping or countervailing duty by reason of

the exemption of such product from duties ... or by reason of the refund of such duties....

General Agreement on Tariffs and Trade, Oct. 30, 1947, 61 Stat. A24, T.I.A.S. No. 1700, 55 U.N.T.S. 214.

manufacture into products for export.[3] Instead, Roquette chose a procedure which requires the application of two EC regulations rather than one. The plaintiff paid import levies on the corn it imported from the United States into France, 18 O.J.Eur. Comm. (No. L 281) 1,2,7 (1975). Subsequently, Roquette received export refunds on the corn content of the exported sorbitol product. 23 O.J.Eur.Comm. (No. L 323) 27 (1980). This latter procedure, unlike inward processing,[4] offers no direct link between levies and refunds on imported and exported goods.

Under the import-export program utilized by Roquette, EC payment of the export refund is not by any means dependent on the prior payment of import levies. Whenever a French manufacturer exports a product containing corn, the aforecited EC regulation provides for the payment of an export refund regardless of (1) whether or not the firm used imported corn, and (2) whether or not the firm paid any import levies. In short, the payment of an import levy is not a precondition for the receipt of an export refund. This fact alone negates Roquette's contention that under its chosen import-export program it both paid import levies on United States corn and received export refunds *by reason of the exportation of the merchandise to the United States.* Roquette admits that "export payments were 'available' to other persons exporting goods manufactured from Community-origin products upon which no import levies were paid."

Counsel for plaintiff has fashioned an argument for allowance of adjustment to purchase price based on the drawback statute of the United States. *See* 19 U.S.C. § 1313. In considering this argument, parties make reference to the legislative history accompanying the Antidumping Act of 1921, which originally contained the same language presently in § 1677a(d)(1)(B). The Senate Report on the then proposed bill stated: "In order that any *drawback* given by the country of exportation upon the exportation of the merchandise ... shall not constitute dumping, it is necessary also to add such items to the purchase price." S.Rep. No. 16, 67th Cong., 1st Sess. 12 (1921) (emphasis added). The court does not deem this statement dispositive of the present determination. It merely serves to instruct that an adjustment to the purchase price should be allowed when the country of exportation makes refund payments constituting a drawback. It does not attempt to serve as guidance in determining whether a drawback exists.

The United States Court of Customs Appeals defined drawback as the "repayment of moneys previously paid in by the exporters upon goods previously imported." *Nicholas & Co. v. United States,* 7 Ct. Cust.Appls., 97, 110 (1916), *aff'd,* 249 U.S. 34, 39 S.Ct. 218, 63 L.Ed. 461 (1919). The purposes of the drawback provision are:

> not only to build up an export trade, but to encourage manufactures in this country, where such manufactures are intended for exportation, by granting a rebate of duties upon the raw or prepared materials imported, and thus enabling the manufacturer to compete in foreign mar-

---

**3.** 12 O.J.Eur.Comm. (No. L 58/1) 75 (1969)

Article 3

1. Exemption from customs duties, charges having equivalent effect and agricultural levies shall be granted in accordance with one of the following methods:

(a) the goods shall be subject to a customs procedure under which the payment of customs duties, charges having equivalent effect and agricultural levies is suspended throughout the period for which the goods remain in the customs territory of the Community;

(b) the amount of the customs duties, charges having equivalent effect and agricultural levies applicable to the imported goods shall be

deposited, and reimbursement of such duties, charges and levies shall be made on exportation of the compensating products obtained therefrom.

    \*    \*    \*    \*    \*    \*

3. Where paragraph 1(a) of this Article applies, the competent authorities may require security to be given in such form and of such amount as they shall determine. *Id.*

**4.** This court expressly withholds judgment on whether the inward processing arrangement comes within the statutory provision of 19 U.S.C. § 1677a(d)(1)(B).

kets with the same articles manufactured in other countries.

*Tide Water Oil Co. v. United States,* 171 U.S. 210, 216, 18 S.Ct. 837, 839, 43 L.Ed. 139 (1898). *See United States v. National Sugar Refining Co.,* 39 CCPA 96, 99 (1951).

Roquette submits that it used either imported corn or domestic EC corn of like kind and quality to manufacture sorbitol which it exported to the United States within a two year period from the time of its importation of the United States corn. This practice Roquette likens to the substitution provisions contained in the United States drawback statute. It is acknowledged that the United States drawback statute permits repayment of duties when domestic merchandise is substituted for duty-paid mechandise of the same kind and quality, and used in the manufacture or production of articles within a period not to exceed three years from receipt of the imported merchandise. 19 U.S.C. § 1313(b). However, as previously stated, the EC payment of the export refund is not dependent on the prior importation of a given quantity of duty-paid merchandise. This distinction negates any contention that the import-export system used by Roquette is a drawback which qualifies for a price adjustment under § 1677a(d)(1)(B).[5] Both the EC import levy and the export refund are determined principally on the basis of the difference between the world and EC price of corn. *See* 18 O.J.Eur.Comm. (No. L 281) 6,7 (1975) (import levy) and 23 O.J.Eur. Comm. (No. L 323) 27 (1980) (export refund). The calculation requires no correlation between the corn in the exported sorbitol and the duty-paid imported corn in terms of quantity, identity or quality.

The court concludes that the ITA acted in accordance with law in denying the price adjustment claimed by the plaintiff and in performing all other aspects of its determination.

ITC Negative Determination

The intervenor challenges the ITC negative determination on remand as to liquid sorbitol alleging that the ITC should have found one sorbitol industry producing one like product albeit in two forms—liquid and crystalline. Phizer does not contend that the finding of no material injury to the liquid sorbitol industry in the United States is unsupported by substantial evidence.

The Trade Agreements Act of 1979 defines "industry" as "the domestic producers as a whole of a *like product,* or those producers whose collective output of the like product constitutes a major proportion of the total domestic production of that product." 19 U.S.C. § 1677(4)(A) (emphasis added). Like products are "product[s] which [are] like, or in the absence of like, most similar in characteristics and uses with, the article[s] subject to an investigation under this subtitle." 19 U.S.C. § 1677(10).

It is undisputed that domestic liquid sorbitol is the "like product" of French liquid sorbitol, and that domestic crystalline sorbitol is the "like product" of French crystalline sorbitol. The basic issues, however, raised by Phizer's challenge are (1) whether liquid and crystalline sorbitol are two separate products comprising two industries, and (2) whether *"available data* permit the separate identification of [liquid and crystalline sorbitol] production in terms of such criteria as the production process or the producer's profits." 19 U.S.C. § 1677(4)(D) (emphasis added).

In determining that liquid and crystalline sorbitol are two distinct products, the ITC properly considered their different characteristics and uses. Although liquid and crystalline sorbitol possess the same chemical formula, they have different physical characteristics after production.[6] Whereas

---

**5.** Under the substitution provision of United States drawback law, the exporter of domestic merchandise must keep records on the "quantity, identity, kind, and quality of the duty-paid merchandise ... designated as the basis for the allowance of drawback on exported articles." 19 C.F.R. § 22.5(a)(1) (1983).

**6.** Both liquid and crystalline sorbitol are hexitols bearing the same chemical formula, $C_6H_8(OH)_6$.

liquid sorbitol is an aqueous substance consisting of approximately thirty percent water, crystalline sorbitol is a solid containing only about three percent water. The manufacture of crystalline sorbitol involves the concentration of liquid sorbitol through the use of additional plants, facilities, and equipment which require further substantial capital outlay. The extra·production process causes crystalline sorbitol to sell at a much higher price than liquid sorbitol.

The two sorbitol products have distinct and dissimilar end uses which prevent their interchangeability. Crystalline sorbitol is primarily used in sugarless gums, mints, and other confections. Liquid sorbitol is used in toothpastes, cosmetics, foods, pharmaceuticals, industrial surfactants, and plastics. The record establishes that, ·"[o]nly crystalline sorbitol can be used in gum and candies and only liquid sorbitol is used in certain toothpastes, detergents, and cosmetics.... In almost every case, liquid sorbitol cannot be substituted for crystalline sorbitol and crystalline sorbitol is not substituted for liquid sorbitol...." [7]

In the legislative history of the Trade Agreements Act of 1979, the Senate commented on the factors relevant to an analysis of the impact of dumping on domestic producers:

> In examining the impact of imports on the domestic producers comprising the domestic industry the ITC should examine the relevant economic factors (such as profits, productivity, employment, cash flow, capacity utilization, etc.) as they relate to the production of only the like product, if *available data permits a reasonably separate consideration* of the factors with respect to production of only the like product.

S.Rep. No. 249, 96th Cong., 1st Sess. 83–84 (1979) U.S.Code Cong. & Admin.News 1979 pp. 381, 469–470 (emphasis added).

It is incumbent on the ITC to acquire all obtainable or accessible information from the affected industries on the economic factors necessary for its analysis.[8] In the ITC investigation, separate data was obtainable or accessible on liquid and crystalline sorbitol. Domestic producers were able either to identify separate production costs for their two respective sorbitol operations or make cost allocations for the two products according to reasonable accounting procedures. A change in the format of the industry questionnaires on remand enabled the Commission to obtain reliable data on the separate production of crystalline and liquid sorbitol with regard to profitability, production, capacity, and employment.

The focus of the ITC's remand investigation was on the sole producers of both liquid and crystalline sorbitol in the United States—Phizer and Imperial Chemical Industries, Ltd. ("ICI"). The record reveals that Phizer treats its sorbitol operations as two "cost centers," identifying production costs separately for liquid and crystalline sorbitol. The firm prepares division level financial statements on both products. For the purposes of the Commission's questionnaire, the firm has allocated general selling and administrative expenses to their liquid and crystalline sorbitol operations on the basis of their respective sales. Phizer admits that it does not "criticize the methodologies brought to bear by the Commission staff on the data available from the domestic producers of sorbitol."

Unlike Phizer, ICI has prepared separate financial statements on liquid and crystalline sorbitol only since 1982. During the period of investigation (January 1—June

---

**7.** ITC Remand Record (Confidential), Document 14 at 8.

**8.** In *Budd Co. v. United States,* 1 CIT 67, 507 F.Supp. 997 (1980), this court had occasion to examine the meaning of the term "available" in the context of 19 U.S.C. § 1673b(a). When the ITC makes its preliminary determination of reasonable indication of injury pursuant to this statute, it must obtain the "best information available." The court defined available as used in the statute in accordance with its common meaning: "In so doing, it is clear that all information that is 'accessible or may be obtained,' from whatever its source may be, must be reasonably sought by the Commission." 1 CIT at 75, 507 F.Supp. at 1003–04. It follows that the ITC should exercise no less diligence in acquiring data for a final determination.

30, 1981), ICI did not make separate internal reports on the two sorbitol products. By using reasonable accounting methodology similar to that used by the company since 1982, however, ICI was able to identify separately liquid and crystalline sorbitol production for the period under investigation. ICI submitted separate data on both products to the Commission staff in response to the post-remand questionnaire.

Phizer further contends that the Tariff Schedules of the United States (TSUS), in providing only one classification for both liquid and crystalline sorbitol,[9] require the ITC to treat the same as one like product. A TSUS classification does not govern an ITC determination:

> The determinations under the antidumping law may properly result in the creation of classes which do not correspond to classifications found in the tariff schedules or may define or modify a known classification in a manner not contemplated or desired by the Customs Service.

*Royal Business Machines v. United States*, 1 CIT 80, 87 n. 18, 507 F.Supp. 1007, 1014 n. 18 (1980), *aff'd*, 669 F.2d 692 (CCPA 1982). This court again has stated:

> [I]t is the ITA which directs customs to assess antidumping duties on given classes or kinds of merchandise and it is Customs which serves at the behest of the ITA in administering the antidumping duty law.

*Diversified Products Corp. v. United States*, 572 F.Supp. 883, 6 CIT —— (1983).

**9.** TSUS Item No. 493.68

**10.** Text of letter from Michael H. Stein, ITC General Counsel, to Lance E. Tunick, attorney for ICI Americas, Inc.:

> As per your conversation today with Bill Perry of our office, ICI has agreed to fill out the producer's questionnaire on *Sorbitol from France* (Court Remand). ICI has also agreed to allow the Commission's personnel to examine at ICI's office confidential documents and memoranda, such as cost basis, which support the questionnaire responses or will help explain the method used to allocate figures to the different types of sorbitol.

### ITC Affirmative Determination

■ From the separate data on the production of liquid and crystalline sorbitol, the ITC further determined on remand that an industry in the United States was materially injured by reason of imports of crystalline sorbitol from France.

Roquette contends that the ITC improperly based its determination in part on information submitted off the record to the Commission's staff. This alleged impropriety related to an agreement between ICI and the ITC General Counsel to allow the Commission staff to examine certain confidential data at ICI's office without taking notes on the disclosed information. In a letter written on August 12, 1983, the General Counsel set forth the purpose of the field trip to ICI.[10] Although the language used in this letter does not make clear whether ICI, at that time, had completed the questionnaire and submitted it to the ITC, the memoranda of the Commission staff made on the August 18, 1983 field trip do make the purpose and scope of the agreement more apparent.

On this field trip, the Commission staff reviewed ICI internal documents on profitability and costs to determine whether the methodology proposed by the firm to report separate data on liquid and crystalline sorbitol was comparable to the accounting methodology used by Phizer.[11] The express purpose of the ICI visit was not to verify specific calculations or data submitted by ICI in its questionnaire responses, but to ascertain the reasonableness of the proposed methodology to allocate costs between liquid and crystalline sorbitol.

> We have agreed that the Commission's staff will not take any notes or copy any figures disclosed in the confidential documents which are examined at ICI's office. Further, any memorandum submitted to the Commission will not disclose any of ICI's confidential figures disclosed to the staff other than those in the questionnaire responses.

**11.** The Commission staff met with both Phizer and ICI prior to the time they completed their questionnaire responses to discuss these concerns.

The Commission only examined those figures contained in the questionnaire responses which became a part of the agency record. All information obtained at the meeting as to methodology was made available to the Commissioners in the form of memoranda which are also a part of the record herein.[12]

To further dispel the appearance of impropriety which might ensue from Roquette's accusation that the staff field trip was a "secret meeting," government counsel calls attention to the fact that the Commission staff, although not required to do so by statute, made a record of the ICI meeting containing all the necessary information demanded for an ex parte meeting. 19 U.S.C. § 1677f(a)(3). Although the statute presently is applicable only to ex parte meetings of Commissioners with interested parties or other persons providing factual information, the staff field memoranda satisfy the statutory requirements with respect to revealing the identity of persons present, date, time and place of the meeting, and a summary of the matters discussed. *Id.*

The court recognizes that the ITC should meticulously avoid any semblance of secrecy appearing in connection with an investigation performed by its staff. However, in the absence of specific evidence indicating that the staff has conducted examinations in a covert manner, this court will not indulge in speculation that improprieties were committed in the course of an investigation.

Roquette further maintains that the ITC finding of material injury to the crystalline sorbitol industry in the United States is unsupported by substantial evidence. Specifically, the plaintiffs contend that the ITC failed to obtain available data on domestic crystalline producers' production costs, and full year 1981 profits and losses. Additionally, Roquette asserts that the evidence fails to establish that crystalline sorbitol imports caused material injury to the domestic industry.

Plaintiff contends that the ITC record on remand does not contain full year 1981 data on profit and loss for domestic producers of crystalline sorbitol. In its responses to the original questionnaire, Phizer reported separate data on liquid and crystalline sorbitol as to its profit and loss for the period January-November 1981 on the basis of *estimated* rather than *actual* costs.[13] However, to eliminate any distortion that might result from the use of data consisting of estimated costs, the Commission staff on remand requested Phizer to provide data for the eleven month period on the basis of actual costs. The record discloses that both Phizer and ICI did in fact provide profit and loss data for the interim period as well as for full year 1981 based on actual costs.[14] A comparison of the data obtained from the eleven month period with that from full year 1981 reveals that the ratio of net operating profit to net sales for crystalline sorbitol was the same for both periods. Since the eleven month data was reported on the same basis (actual costs) as the full year 1981 data and the analysis performed on these data bases produced comparable results, the ITC was justified in accepting the interim period data in its determination of material injury.

The fact that the administrative record does not contain a separate table for domestic crystalline producers' production costs (as it does for liquid sorbitol), cannot serve as justification for Roquette's contention that the Commission had no basis for calculating profitability ratios and thus, its material injury determination was "fatally infirm." Aggregate data on cost of goods sold is contained in another table on crystalline sorbitol producers' profit and loss

**12.** ITC Remand Record (Confidential), Document 17B.

**13.** The Commission staff used eleven month data in its investigation and report, because Phizer closes its plant in December.

**14.** ITC Remand Record (Confidential), Documents 17.01 and 17.04.

experience.[15] The ITC requested and obtained information on the production costs for crystalline sorbitol as it had done for liquid sorbitol. The fact that the Commission staff presented the available data to the Commission in the form of questionnaire responses instead of tabular form is within the realm of administrative discretion and not subject to judicial censure absent some showing of improper administrative procedure.

The data presented in the administrative record on remand offers substantial evidence for the conclusion that the domestic crystalline sorbitol industry has suffered material injury. The record well supports the Commission findings of a substantial decline in United States production and commercial shipments of crystalline sorbitol. During the years 1978–81, the capacity of domestic producers of crystalline sorbitol remained relatively stable whereas their capacity utilization experienced a dramatic decline. The record also indicates decreases in domestic employment, wages, and hours worked in the crystalline sorbitol industry. Finally, and most importantly, the record indicates a weakening of the financial position of the domestic crystalline sorbitol industry as evidenced by the absolute decline in net operating profit and its relative decline in comparison to net sales.

The ITC determination on remand sets forth three findings relating to material injury by reason of sales at less than fair value. The Commission found a causal connection between less than fair value sales of crystalline sorbitol from France and the material injury to the domestic industry in that: (1) French imports increased "absolutely and relative" to domestic consumption, (2) domestic producers experienced a considerable amount of lost sales due to imports, and (3) Roquette undersold its domestic competitors during 1978–80. The foregoing findings are based on substantial evidence. Although the record admittedly contains evidence which might suggest a different conclusion, the statute does not mandate a weighing of factors, which might contribute to the overall injury to an industry, when the factors given by the ITC as a basis for its determination of material injury are supported by substantial evidence on the record. H.Rep. No. 317, 96th Cong., 1st Sess. 47 (1979).

From a review of the record in the instant action, the court concludes that:

(1) the affirmative determination of the ITA on the matter of less than fair value sales of Sorbitol from France, and

(2) the affirmative determination of the ITC as to material injury to a United States industry by reason of imports of crystalline sorbitol from France, and

(3) the negative determination of the ITC as to no material injury to a United States industry by reason of imports of liquid sorbitol from France

are affirmed.

Judgment affirming the determinations of the ITA and the ITC on remand will be entered accordingly.

15. ITC Remand Record (Confidential), Document 15 at A–45.