USX CORPORATION, f/k/a United States Steel Corporation, Plaintiff,

v.

The UNITED STATES and United States International Trade Commission, Defendants,

and

Propulsora Siderurgica, S.A.I.C., Defendant-Intervenor.

Court No. 85–03–00325.

United States Court of International Trade.

Feb. 9, 1987.

488

U.S. Steel Corp. John J. Mangan, J. Michael Jarboe, Peter J. Koening and Robin K. Capozzi, Pittsburgh, Pa., for plaintiff.

Lyn M. Schlitt, Washington, D.C., General Counsel, Michael P. Mabile, Asst. General Counsel, Tallahassee, Fla., and Carol McCue Veratti, U.S. Intern. Trade Com'n, for defendants.

Mudge Rose Guthrie Alexander & Ferdon, David P. Houlihan, Jeffrey S. Neeley, Ann H. Price and Kevin B. Dwyer, Washington, D.C., for defendant-intervenor.

## OPINION AND ORDER

RESTANI, Judge:

Plaintiff initiated this action to challenge a final negative determination of the Inter-national Trade Commission (ITC) regarding cold-rolled carbon steel plates and sheets from Argentina.[1] After finding that the U.S. cold-rolled carbon steel plate and sheet industry continues to be materially injured, ITC concluded that such injury was not by reason of Less Than Fair Value (LTFV) imports from Argentina. ITC also determined that LTFV imports from Argentina presented no threat of material injury. Plaintiff argues that these findings were in error for several reasons: 1) ITC failed to evaluate the *significance* of the volume of LTFV imports from Argentina; 2) ITC improperly based its negative determination on a finding of no confirmed instances of lost sales or revenue; 3) ITC failed to cumulate Argentine imports with those from several other countries; and 4) ITC's negative determination with respect to threat of material injury was based on stale data regarding capacity utilization in the Argentine steel industry. These contentions are addressed below, following a brief discussion of the factual background of the case.

### Facts

Plaintiff filed its administrative petition with the United States Department of Commerce, International Trade Administration (ITA) and ITC on February 10, 1984. In its petition plaintiff alleged that cold-rolled sheet from Argentina was being sold, or was likely to be sold, in the United States at LTFV and, further, that such imports were a cause of material injury, or a threat thereof, to the corresponding domestic industry.

Following an affirmative preliminary material injury determination by ITC on March 26, 1984, ITA issued a preliminary determination that Argentine cold-rolled sheet was, or was likely to be sold in the United States at LTFV.[2] As a result of its determination, ITA ordered a suspension of liquidation with respect to all cold-rolled sheet from Argentina entered, or with-

---

1. The challenged determination is found in USITC Pub. No. 1637, January 1985. (ITC Determination).

2. ITC's preliminary determination was published at 49 Fed.Reg. 13442 (1984); ITA's determination was published at 49 Fed.Reg. 29991 (1984).

drawn from warehouse for consumption, on or after July 25, 1984.

In its final determination, ITA found that 100% of Argentine cold-rolled sheet was being sold in the United States at less than fair value. Weighted average dumping margins were 242.5% and 30.3% for two specific producers, and 122.3% for all others. 49 Fed.Reg. 48588, 48591 (1984). ITC subsequently initiated its final investigation, which disclosed the following facts.

The volume of Argentine cold-rolled steel imports rose constantly during the period under review, from zero tons in 1981, to 130,000 tons in 1983. During the first nine months of 1984, when liquidation of these imports was suspended, 116,000 tons were imported, which represented a 26% increase over the volume imported during the first three quarters of 1983. Following the initial introduction of Argentine cold-rolled steel into the U.S. market in 1982, levels of market penetration by Argentine imports remained fairly constant in the years reviewed by the investigation, fluctuating between .8% and .9% of the U.S. market.

The U.S. cold-rolled steel industry was mired in a recession when Argentine imports first entered the market in 1982. That year nine U.S. firms reported operating losses and the U.S. industry experienced an overall loss of $371 million. By the end of the investigatory period in 1984, the industry had shown some improvement. Shipments, capacity utilization, and employee hours had all increased by roughly 25% as compared with the industry's most depressed period in 1982. Prices of several products examined by ITC also showed increases of 10–12% from the deepest stages of the industry recession to September 1984.

Despite these gains, in September 1984 the industry still lagged behind 1981 levels in shipments and employee hours, and showed an overall loss of $43 million. Prices of domestic steel products, though higher than prices during the industry recession, were only slightly higher than pre-recession prices in 1982. These facts led ITC to conclude that the U.S. industry continued to be materially injured, but not by reason of LTFV imports from Argentina.

## Determination of No Injury by Reason of LTFV Imports from Argentina

In reviewing this determination, the court must grant a proper level of deference to ITC. The views of this court may not be freely substituted for those of ITC; nor may reversal be predicated solely on an interpretation of the facts that seems more reasonable. Only if ITC's determination is not supported by substantial evidence, or if it was reached in a manner contrary to law, may it be overturned.

ITC is required to consider three factors when examining the causal connection between imports and material injury: 1) the volume of imports, 2) the effect of imports on prices of like domestic products, and 3) the impact of imports on domestic producers of like products. 19 U.S.C. § 1677(7)(B) (1982). ITC presented its brief discussion of these factors as follows. First, ITC noted that although imports from Argentina rose consistently from 1981 to 1984, only "minimal market penetration" was achieved throughout the period of the investigation. ITC Determination at 6. Second, ITC found that while Argentine imports undersold domestic cold-rolled sheets by margins ranging from 5% to 14%, it could not confirm any actual instances of lost sales and revenue due to Argentine imports. *Id.*

In light of the facts of this case, and relevant administrative and judicial precedent, this analysis must be rejected. Under the "substantial evidence" standard of review, the court must determine whether ITC's conclusions are supported by the evidence on the record *as a whole. SSIH Equip. S.A. v. United States Int'l. Trade Comm'n.*, 718 F.2d 365, 382 (Fed.Cir.1983) (additional comments of Circuit Judge Nies, quoting from *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477, 488, 71 S.Ct. 456, 459, 464, 95 L.Ed. 456 (1951)). ITC may not rely upon isolated tidbits of data which suggest a result contrary to the clear weight of the evidence. In this case, the reasons presented by a majority of the commissioners, without further elabora-

tion, cannot reasonably be said to support the result reached.

■ In its discussion of import volume, ITC focused exclusively on the level of market penetration achieved by Argentine imports. ITC's analysis of market penetration data consisted solely of the statement that levels of market penetration remained low and stable.[3] Without discussing the significance of this trend or its relationship to other facts uncovered in the investigation, ITC then stated its bald conclusion that the U.S. industry had not been materially injured by reason of Argentine imports. The court has noted that "Congress has not only directed ITC to state its determinations but has also required the agency to *explain* those determinations...." *SCM Corporation v. United States*, 2 CIT 1, 3, 519 F.Supp. 911, 913 (1981) (emphasis in original) (quoting *SCM Corporation v. United States*, 84 Cust.Ct. 227, 242, 487 F.Supp. 96, 108 (1980)). In this case, ITC has failed to articulate any rational connection between low levels of market penetration by Argentine imports and its final negative determination. Under these circumstances, a remand is the proper remedy. *See* 2 CIT at 4, 519 F.Supp. at 913.

Congress, this court, and ITC itself have repeatedly recognized that it is the *significance* of a quantity of imports, and not absolute volume alone, that must guide ITC's analysis under section 1677(7). *See Atlantic Sugar, Ltd. v. United States*, 2 CIT 18, 23, 519 F.Supp. 916, 921–22 (1981). This view is reflected in the legislative history of the Trade Agreements Act of 1979, in which Congress acknowledged:

> For one industry, an apparently small volume of imports may have a significant impact on the market; for another, the same volume might not be significant.

H.R.Rep. 317, 96th Cong., 1st Sess. 46 (1979).

In the past, ITC has recognized that import volume alone cannot be used to gauge accurately the effects of imports in the cold-rolled steel industry. ITC noted that cold-rolled steel is inherently price sensitive and fungible, and stated that "the impact of seemingly small import volumes ... is magnified in the marketplace." *Certain Carbon Steel Products from Spain*, USITC Pub. No. 1331, at 16–17 (1982). In the case cited above ITC based its affirmative finding on a level of market penetration of 0.5%, roughly one-half the level involved in this case.

■ In its brief, ITC has attempted to distinguish the Spanish steel case by arguing that industry conditions were far more depressed at the time that decision was rendered. *See* discussion of industry conditions, *supra* page 4. But this argument miscasts the real basis of the Spanish steel decision: the inherent fungibility and price sensitivity of the product. These factors make small quantities of imports particularly significant in the U.S. market. Although the general health of the U.S. industry may be one possible consideration in assessing the effect of a small volume of imports, it was not cited as a significant consideration in arriving at this negative determination. Furthermore, the mere fact that an industry has been lifted out of a recession can not automatically trigger the conclusion that foreign imports are not affecting the domestic market. The economic recovery of an industry can also be stymied by low-priced imports, which expand their share of the recovering market and create artificially low prices. In this case Argentine imports expanded throughout the domestic industry's recession and recovery, and consistently undersold domes-

---

**3.** Defendant-intervenor argues that ITC's determination is also supported by evidence that Argentine imports comprised a progressively smaller share of total cold-rolled steel imports between 1982 (7%) and 1984 (4%). In the absence of any reasoning related to such a fact, its mere existence cannot be used to sustain ITC's determination before this court. *Budd Co., Ry. Div. v. United States*, 1 CIT 67, 75–76, 507 F.Supp. 997, 1004 (1980) (citing *Securities and Exchange Comm'n v. Chenery*, 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947)). Furthermore, it is unclear how this fact is probative on the issue of causation in light of other evidence that Argentine imports increased progressively from 1981 to 1984, and reached their highest level as a percentage of U.S. production during the first three quarters of 1984 (1.2%).

tic products.[4] In light of these trends, ITC's limited discussion of import volume is inadequate to support its decision.

■ ITC's failure to confirm instances of lost sales and revenue attributable to Argentine imports is also an inappropriate justification for the negative determination. ITC has admitted that it failed to investigate four of seven allegations of lost sales and all three reported instances of lost revenue. Based solely on this limited investigation, ITC concluded that proven, consistent margins of underselling between 4% and 16% did not support an affirmative finding.

It is, of course, axiomatic that an administrative agency may not base its decision on inadequately collected data. *Atlantic Sugar, Ltd. v. United States*, 744 F.2d 1556, 1561 (Fed.Cir.1984). To correct procedural errors of this nature, a remand back to the agency is often the appropriate remedy. *Id.* In this case, however, ITC argues that a remand is not necessary because anecdotal evidence about lost revenue is often unpersuasive in cases involving fungible goods. *Gifford-Hill Cement Co. v. United States*, 9 CIT ——, 615 F.Supp. 577, 586 (1985). Thus, ITC contends that remanding this action would serve no useful purpose.

■ Defendant did not misstate the position of the court with regard to anecdotal evidence of lost sales and revenue in antidumping investigations. *See also, Lone Star Steel Company v. United States*, 10 CIT ——, 650 F.Supp. 183, 185–86 (1986). It has, however, misperceived its import. In some cases anecdotal evidence of lost revenue may shed some light, but such evidence is not, *per se*, a reason to remand a negative determination. Neither is the lack of such evidence, *per se*, a justification for a negative decision, especially where an inadequate investigation has occurred.

Since ITC has relied exclusively upon instances of lost sales and revenue to show the effect Argentine imports have had on the U.S. industry, it must undertake a more thorough investigation and consideration of these factors. In the face of steadily rising import volume and proven margins of underselling between 4% and 16%, ITC's analysis cannot be deemed supported by substantial evidence.

**Cumulation**

Plaintiff also challenges ITC's decision not to cumulate Argentine imports with those from Brazil, Korea, South Africa and Spain.[5] Individual commissioners offered a number of different reasons for rejecting cumulation in this case. One commissioner stated that it was improper to engage in the practice of "cross-cumulating" imports. ITC Determination at 9–10. Cross-cumulation occurs when imports subject to antidumping orders are cumulated with imports subject to duties under the countervailing duty laws. Two others rejected cumulation because Argentine imports did not "contribute to the material injury suffered by the domestic industry." *Id.* at 8 n. 30. Another commissioner refused to cumulate imports because there was "no evidence of coordinated activity between Argentina and any other country...." ITC Determination at 8 n. 29.

The court starts with the premise that ITC's past practice has been to cumulate where the conditions of trade so warrant. *See Certain Steel Products from Belgium, Brazil, France, Italy, Luxembourg, The Netherlands, Romania, The United Kingdom, and West Germany*, USITC Pub. No. 1221, at 16–17 (1982). Where the conditions of trade indicate cumulation would be appropriate, it may be arbitrary and an abuse of discretion to fail to cumulate. *See Lone Star Steel Co.*, 650 F.Supp. at 186 (prior to the 1984 Act commissioners

---

4. ITC's determination states that published domestic prices during 1982 and 1983 did not reflect market reality, and that discounting of prices continued during 1983. These facts may indicate that steel imports reduced potential price increases during the industry's recovery period. ITC Determination at a–23 n. 1.

5. Cumulation is a method of assessing the volume and price effects of imports from a particular country by examining the volume and effect of imports from that country together with like imports from other countries.

may find cumulation is not appropriate where the subject countries' imports display disparate trends with respect to underselling and import volume). *See also, American Grape Growers Alliance v. United States,* 9 CIT ——, 615 F.Supp. 603, 605 (1985) (stating, in *dictum,* that a final determination not to cumulate because imports are not "like products" should be based on fully developed investigative facts), *remanded on other grounds,* No. 85–2717 (Fed.Cir. April 7, 1986) (remanded for reconsideration in light of *American Lamb Co. v. United States,* 785 F.2d 994 (Fed.Cir.1986)). The four commissioners who elected not to cumulate imports did not base their decisions on a single reason or set of reasons. Thus, the commissioners' opinions must be examined separately.

Initially, the court addresses the contention that cumulation is inappropriate because Argentine imports, standing alone, were not a contributing cause of injury. The commissioners based their conclusion on the relatively stable U.S. market share of Argentine steel, and the absence of reported instances of lost sales and revenue. ITC Determination at 8 n. 30.

The court has noted that the propriety of the "contributing effect" test depends on how the test is applied. Prior to the effective date of the Trade and Tariff Act of 1984,[6] where one nation's exports to the U.S. demonstrated trends in the U.S. market that were distinct from the market patterns of other countries' exports, or where other conditions of trade indicated that cumulation would be inappropriate, the "contributing effect" test could justify a decision not to cumulate.[7] In this case, the commissioners' decision not to cumulate was based, in part, on the fact that Argentine imports "remained at a relatively constant or declining share of the market while imports from other sources were

increasing." ITC Determination at 8. Such a difference in market trends may justify a decision not to cumulate imports, provided such trends reflect actual differences in the way imports affect the domestic market. Here, however, it is possible that the disparate trends were caused by the initiation of these proceedings and ITA's subsequent orders to suspend liquidation. This court and ITC consistently have recognized that the initiation of antidumping and countervailing duty proceedings can create an artificially low demand for affected imports, thus distorting the data on which ITC relies in making its determination. *Rhone Poulenc, S.A. v. United States,* 8 CIT 47, 53, 592 F.Supp. 1318, 1324 (1984). In this case, despite the suspension of liquidation of Argentine imports, import volume actually *increased* by roughly 25% over the same period in 1983. While the size of this increase may seem small compared to the advances made by Spain (327%) and the Republic of Korea (155%) during the same period, the increase might have been much larger had liquidation of imports not been suspended. In general, data compiled by ITC indicate that antidumping and countervailing duty proceedings probably had a strong effect on foreign import volume. Brazil, Spain, and Korea all experienced reduced export volume in years when investigations were initiated or liquidation of imports was suspended. *See* ITC Determination at a–21 and at Appendix G. In some cases, the court will defer to ITC's judgment as to the cause of the disparate trends. It is clear in this case, however, that ITC did not analyze the issue fully. For example, not all of the exporting countries with which the plaintiff has requested cumulation experienced dramatic increases in absolute volume and market share.[8] The court cannot defer to a decision which is based on inadequate analysis or reasoning.

---

**6.** *See* 19 U.S.C. § 1677(7)(C)(iv) (Supp. III 1985) (establishing a "competition" standard for cumulating imports).

**7.** *See Lone Star Steel Co.,* 650 F.Supp. at 187; *Gifford-Hill,* 9 CIT at ——, 615 F.Supp. at 590 n. 16.

**8.** Brazilian imports actually declined during the first three quarters of 1984, as did imports from South Africa. In the case of Brazil, this reduction might be linked to a suspension of liquidation of Brazilian imports which took effect on November 12, 1983.

The contributing effect test is also improperly applied when it creates a process of circular reasoning that renders cumulation a vestigial part of the causation analysis. *Lone Star,* at 186 & n. 6. The approach taken by the commissioners here may be said to be illustrative of the problem. The commissioners based their decision not to cumulate, in part, on the lack of confirmed lost sales and revenue in the U.S. market. ITC Determination at 8. These are the same factors that were cited as the basis for ITC's negative determination. Following this approach, in order for cumulation to be appropriate, evidence would first have to provide grounds for an affirmative determination regarding Argentine imports alone. In other words, this application of the "contributing effect" test requires independent causation of material injury to be demonstrated before cumulation may be used to analyze causation.

Congress specifically rejected a Senate proposal that would have incorporated this version of the "contributing effect" test in the 1984 Act, stating,

[t]he requirement in the bill as introduced that imports from each country have a "contributing effect" *in causing material injury* would have precluded cumulation in cases where the impact of imports from each source treated individually is minimal but the combined impact is injurious.

H.R.Rep. No. 725, 98th Cong., 2d Sess. 37, *reprinted in* 1984 U.S.Code Cong. & Ad. News 4910, 5127, 5164 (emphasis added).

Despite this legislative history and the apparent circularity of the test as applied in this case, defendant argues that the commissioners' decision was proper in light of past judicial precedent, and because Congress failed to apply the 1984 Act retroactively. The latter contention carries little weight. The legislature's decision to apply the 1984 Act prospectively cannot reasonably be viewed as an implied temporary ratification of the type of "contributing effect" test used here. Nothing in the legislative history suggests that such a result was intended; indeed, it is more probable that Congress chose to make all of the definitional sections of the new Act prospective for the sake of convenience.

Defendant also cites dicta from a case of this court to support its position, *Republic Steel Corp. v. United States,* 8 CIT 29, 591 F.Supp. 640 (1984). In that case the court held that the "contributing effect" test was not appropriate for *preliminary* injury determinations in countervailing duty suits. 8 CIT at 32, 591 F.Supp. at 644.[9] The court went on to state, in *dictum,* that at the final determination stage cumulation operates "only in conjunction with findings of contribution to injury from the products of particular countries." 8 CIT at 35, 591 F.Supp. at 646. The court explained the concept of "contribution to injury" in *Republic Steel* as follows:

Common principles of fairness dictate that the final injury determination must be based on some factual connection between the imports from a specific country and an aspect of the injury to the domestic industry.

8 CIT at 34–35, 591 F.Supp. at 645.

This "factual connection" between imports and injury is currently provided by the "competition" test in the 1984 Act. Prior to the effective date of the Act, this nexus could be shown by proof that categories of foreign imports displayed similar patterns or effects in the domestic market. *Lone Star Steel Co.,* at 187. The circular reasoning which confronts the court in this case was in no way condoned in *Republic Steel.*

Another commissioner refused to cumulate imports because there was no evidence of "coordinated activity" between Argentina and other countries. This position was based on the "traditional analysis" of coordinated activity that the commissioner had applied in other proceedings. ITC Determination at 8 n. 29. In these prior proceedings the commissioner limited the meaning of "coordinated activity" to concerted ac-

---

**9.** *Republic Steel* was recently overruled in part in *American Lamb Co. v. United States,* 785 F.2d 994 (Fed.Cir.1986). The Court of Appeals decision did not address the issue of cumulation, however, so *Republic Steel* continues to be valid precedent on this point.

tion by importers or exporters of a commodity. *Potassium Chloride from Israel and Spain,* USITC Pub. No. 1596, at 7 n. 29 (1984); *see also, Oil Country Tubular Goods from Argentina and Spain,* USITC Pub. No. 1694, at 20 n. 3 (1985). The court previously held that there is no legal support for this test, to the extent it implies an "intent requirement" on the part of exporters. *Lone Star Steel Co.,* at 186 n. 7. Certainly, this type of concerted action would weigh heavily in a decision to cumulate, but it is not an absolute requirement for cumulation.[10] Simply put, sole reliance upon such a test is inconsistent with the purposes of cumulation.

Finally, one commissioner stated that cumulation is always inappropriate when it would require, as in this case, cumulation across different unfair trade statutes. ITC Determination at 9–10. Plaintiff contends, to the contrary, that cross-cumulation is *required* in light of the court's recent decision in *Bingham & Taylor Div. v. United States,* 10 CIT ——, 627 F.Supp. 793 (1986), *appeal docketed,* No. 86–1140 (Fed.Cir. June 24, 1986). In *Bingham & Taylor,* which concerned a preliminary injury determination under the countervailing duty law, the court held that 19 U.S.C. § 1677(7)(c)(iv) (Supp. III 1985) requires ITC to assess cumulatively the volume and effect of competing imports which are subject to both antidumping and countervailing duty investigations. 10 CIT at ——, 627 F.Supp. at 795. This statutory provision had not yet taken effect when this action was initiated, so the issue facing this court is whether the commissioner's reliance on cross-cumulation as a reason for not cumulating imports was contrary to law because

it was arbitrary, an abuse of discretion or otherwise unsupported by law.

Initially, the court notes that after the Customs Court's decision in *City Lumber Co. v. United States,* 61 Cust.Ct. 448, 290 F.Supp. 385 (1968), *aff'd,* 64 Cust.Ct. 826, 311 F.Supp. 340 (App.Term 1970), *aff'd,* 59 CCPA 89, 457 F.2d 991 (1972), members of the Tariff Commission and ITC frequently cumulated imports under the 1921 and 1979 Acts. *See, e.g., Aminoacetic Acid (Glycine) from France,* TC Pub. No. 313 (1970); *Perchloroethylene from Belgium, France, and Italy,* USITC Pub. No. 969 (1979). *Carbon Steel Wire Rod from the German Democratic Republic,* USITC Pub. No. 1607 (1984) (preliminary determination). *Potassium Chloride from Israel and Spain,* USITC Pub. No. 1596 (1984) (views of Commissioner Rohr). The practice of cumulation was limited, however, to cases in which the subject imports were all being challenged under the same unfair trade statute. In previous ITC decisions, several commissioners invited parties to comment on the legality of cross-cumulation, but the issue was never squarely addressed. *See, e.g., Carbon Steel Wire Rod from Brazil, Belgium, France, and Venezuela,* USITC Pub. No. 1230, at 20 (1982) (preliminary). Except for a fleeting reference to cross-cumulation in a prior case, this court has never ruled on the validity of cross-cumulation at the final determination stage.[11]

In this case, the commissioner's decision not to cumulate across statutes was based on section 735(b) of the 1979 Act, 19 U.S.C. § 1673d(b)(1) (1982), which requires that "final antidumping determinations are to be made 'by reason of imports of the merchandise with respect to which the administering authority has made an affirmative

---

**10.** As previously explained by Commissioner Stern, a decision to cumulate imports involves many considerations, including "the presence or absence of coordinated action and/or common approaches to the domestic market (*even if not coordinated*) so as to exhibit a collective 'hammering' effect on the domestic industry." *Certain Carbon Steel Products from Belgium, the Federal Republic of Germany, France, Italy, Luxembourg, the Netherlands, and the United Kingdom,* USITC Pub. No. 1064, at 66 (1980) (emphasis added). The words "coordinated activity," as used in the case at hand, appear to require

evidence of joint planning. If the court has misunderstood the term "coordinated activity," ITC can easily clarify this point, and cite evidence of lack of coordination, if such exists.

**11.** *See Gifford Hill,* 9 CIT at ——, 615 F.Supp. at 590 n. 16 (1985) (noting that for cases prior to the 1984 Act no statutory language or legislative history seems to require cross-cumulation merely because dumped or subsidized imports from two or more foreign countries compete in the same U.S. market).

determination under section 735(a)(1),' i.e., those investigations for which Commerce has made a final dumping finding." [12] ITC Determination at 9. The commissioner's argument based on section 735(a)(1) of the Act, and defendant's argument based on 19 U.S.C. §§ 1671(a) and 1673 both rely on reasoning that was previously rejected by the court. In discussing a preliminary injury determination by ITC the court noted that defendant's reading of sections 1671(a) and 1673 would not only prevent cross-cumulation, but "would equally prohibit the cumulation of imports subject to two or more investigations of the same unfair trade practice." *Bingham & Taylor*, 10 CIT at ——, 627 F.Supp. at 798. Under the same analysis, if the language of section 735(a)(1) were construed to require ITC to base its final injury determination on the volume and effect only of imports of "the merchandise with respect to which [Commerce] has made an affirmative determination," cumulation of imports covered by separate investigations would always be prohibited. The court has not construed sections 1671 and 1673 in a manner that comports with defendant's interpretation. To ratify defendant's interpretation of these provisions, the court would have to reject the established practice of cumulating imports from separate investigations and its own reasoning in cases such as *Bingham & Taylor* and *City Lumber*.[13]

The legislative history of the 1979 Act strongly suggests that Congress did not enact sections 1671 and 1673 to restrict the scope of cumulation. When Congress enacted sections 1671 and 1673, the Tariff Commission and ITC had already been cumulating imports from separate investigations for more than 10 years under the Antidumping Act of 1921, ch. 14, § 201, 42 Stat. 9, 11 (1921) (repealed 1979). *See City Lumber Co.*, 61 Cust.Ct. 448, 290 F.Supp. 385. Although the legislative history of the 1979 Act does not specifically refer to this prior practice, it does indicate that Congress intended for causation determinations in dumping and countervailing duty proceedings to be based on the same standards used under the 1921 Act. H.R.Rep. No. 317, 96th Cong., 1st Sess. 46–47; S.Rep. No. 249, 96th Cong., 1st Sess. 57, U.S.Code Cong & Admin.News 381. Assuming *arguendo* that sections 1671 and 1673 relate to cumulation, they may therefore be viewed as a restatement of prior law.[14] The court has stated that where a statute is ambiguous but has been re-enacted without change, longstanding administrative practice is deemed to have been incorporated into the statute by Congress. *Kuehne & Nagel, Inc. v. United States*, 10 CIT ——, Slip Op. 86–138, at 7 n. 8 (December 22, 1986) [Available on WESTLAW,

---

12. Defendant presents a related argument based on 19 U.S.C. §§ 1671(a) and 1673 (1982). Since this action was initiated prior to the effective date of the 1984 Act, the relevant language of section 1673 provides:

If—
    (1) the administering authority determines that *a class or kind of foreign merchandise* is being, or is likely to be, sold in the United States at less than its fair value, and
    (2) the Commission determines that—
    (A) an industry in the United States—
    (i) is materially injured, or
    (ii) is threatened with material injury, or
    (B) the establishment of an industry in the United States is materially retarded, *by reason of imports of that merchandise,*
then there shall be imposed upon *such merchandise* an antidumping duty, in addition to any other duty imposed, in an amount equal to the amount by which the foreign market value exceeds the United States price for the merchandise.

19 U.S.C. § 1673 (1982) (emphasis added).
Defendant argues that the language of this provision restricts the ITC's injury investigation in antidumping cases to the injury caused solely by reason of *dumped* imports. Defendant cites similar language in 19 U.S.C. § 1671(a) to support the same argument with respect to injury determinations under the countervailing duty law.

13. The commissioner who objected to cross-cumulation in this case apparently endorses the practice of cumulating imports from separate investigations. *See Carbon Steel Wire Rod From the German Democratic Republic*, USITC Pub. No. 1607, at 8–11 (1984) (Spanish and Argentine imports cumulated with East German imports subject to a separate investigation).

14. *Compare* 19 U.S.C. § 160(a) (1976) *with* 19 U.S.C. § 1673a (1982) (containing the same injury requirement).

DCTU database] (citing *Commonwealth Oil Refining Co. v. United States*, 60 CCPA 162, 174 C.A.D. 1105, 480 F.2d 1352 (1973)). Thus, if it took any action regarding cumulation by enacting sections 1671 and 1673, Congress endorsed the prior practice of cumulating imports from separate investigations, and rejected the noncontextual reading defendant has given these provisions.

Although its intent is not directly applicable, the Congress which passed the 1984 Act did not view sections 1671 and 1673 as imposing substantive restraints on cumulation. The mandatory cumulation provision in the 1984 Act was designed to prevent commissioners from using improper legal criteria in cumulation decisions, not to correct perceived limitations imposed on cumulation by sections 1671 and 1673. *See Options to Improve the Trade Remedy Laws: Hearings Before the Subcomm. on Trade of the Comm. on Ways and Means*, 98th Cong., 1st Sess. 197, 203 (1982) (statements of Adolph J. Lena). The cumulation amendment was not made part of sections 1671 or 1673, the general rules for imposition of additional duties,[15] but was included in section 1677(7), the specific provision defining material injury for both the countervailing duty and antidumping statutes. If the 1984 Congress had viewed sections 1671 and 1673 as barring cumulation, it certainly would not have allowed the "restrictive" language in these sections to stand without amendment. In light of this history, defendant's attempt to infuse these

provisions with additional substantive direction on the issue of cumulation must be rejected.[16]

The court's reasoning in *Bingham & Taylor* also disposes of the defendant's second argument, that is, that Congress implicitly disapproved cross-cumulation when, in accordance with GATT, it enacted separate injury tests for antidumping and countervailing duty actions. In *Bingham & Taylor*, the court stated that although Congress did enact separate injury tests, "the definition of material injury, the respective indicia of injurious impact, and the causal nexus between the injury and the unfairly traded imports are identical for subsidy and dumping investigations and are outlined in a common statutory provision—19 U.S.C. § 1677(7)." *Bingham & Taylor*, 10 CIT at ——, 627 F.Supp. at 797. Thus, Congress' decision to enact separate injury tests did not create substantive differences in the law that would justify an across-the-board prohibition of cross-cumulation.

Defendant suggests, however, that cross-cumulation is nonetheless inappropriate because only cosignatories of the Subsidies Code are entitled to an injury determination in countervailing duty cases. Defendant contends that Congress created this distinction in order to encourage countries to sign the Code. Although defendant has accurately described the intent of Congress, it has not provided a persuasive reason for rejecting cross-cumulation. To protect their exports, non-signatory countries

**15.** In *Badger-Powhatan Division v. United States*, 10 CIT ——, ——, 633 F.Supp. 1364, 1370 (1986), *appeal dismissed for lack of jurisdiction*, 808 F.2d 823 (Fed.Cir.1986), the court ruled that section 1673 controls the actual imposition of duties by ITA. The court did not hold that it governs the specifics of ITC injury methodology.

**16.** In the past, the court has recognized the importance of maintaining distinct procedures for the calculation of antidumping and countervailing duty margins by ITA. *See Al Tech Specialty Steel Corp. v. United States*, 10 CIT ——, 651 F.Supp. 1421, 1430 (1986); *Huffy Corp. v. United States*, 10 CIT ——, 632 F.Supp. 50, 55–56 (1986). These cases do not cast doubt on the legality of cross-cumulation. Injury determinations by ITC, unlike ITA margin calculations, do not relate directly to the amount of duties paid by the importer, and therefore do not under-

mine the integrity of the two statutes. Furthermore, unlike information gathered by ITA for subsidy and dumping margin determinations, the data relevant to injury determinations by ITC is the same in countervailing duty and dumping cases. The court's reasoning in *Al Tech* actually supports the result reached here. In *Al Tech* the court noted that, in non-market ecomomy cases, the use of subsidized economies as surrogates would distort the calculation of dumping margins by providing a defective measuring rod. *Al Tech*, 651 F.Supp. at 1428 (citing *Chemical Products v. United States*, 10 CIT ——, 650 F.Supp. 178 (1986)). In this case, the exclusion of subsidized imports otherwise eligible for cumulation would similarly distort ITC's causation analysis by understating the full impact of like products in the domestic market.

will continue to have a strong incentive to sign the Subsidies Code, lest their exports be deprived of an injury analysis *in toto*.[17]

■ For these reasons, the court holds that prior to the 1984 Act, even though cross-cumulation was not mandatory for all competing imports, it was not forbidden by statute. Because a majority of the commissioners failed to cumulate imports for reasons that are contrary to law, this issue is remanded to ITC for further consideration.[18]

### Threat of Material Injury

In determining whether a group of imports presents a threat of material injury to the domestic industry ITC should focus on:

> demonstrable trends—for example, the rate of increase of the subsidized or dumped exports to the U.S. market, capacity in the exporting country to generate imports, [and] the likelihood that such exports will be directed to the U.S. market taking into account the availability of other export markets,....

H.R.Rep. No. 317, 96th Cong., 1st Sess. 47 (1979).

In its determination, ITC concluded that there was no threat of material injury by reason of Argentine LTFV imports. This conclusion was supported by evidence that domestic shipments of cold-rolled steel in Argentina had increased from 1981 to 1983, and that Argentine producers were operating at maximum capacity in producing cold-rolled sheets. ITC Determination at 7–8. The investigation also revealed that between 1981 and 1984 the United States received a progressively larger share of total Argentine steel exports, and that the total volume of these exports to the U.S. had been increasing yearly. ITC was also aware that three other nations which had formerly been under investigation had entered into voluntary restraint agreements with the U.S. government. This fact, and Argentina's need to earn dollars for debt repayment, created a strong incentive for Argentina to capture a greater share of the U.S. import market.

The principal point of controversy with respect to the threat determination concerns ITC's use of Argentine production capacity figures for 1983. As discussed above, ITC relied almost exclusively on this data in formulating its negative determination. Plaintiff contends that these data are stale, and do not accurately reflect Argentina's production capacity as it existed at the time of the determination. Defendant makes two counterarguments: first, that the threat determination was properly based on the "best available evidence," and, second, that the plaintiff has waived its right to object to the 1983 data by not raising the issue at an earlier stage in the proceedings.

Plaintiff draws support for its position from *Timken Co. v. United States,* 10 CIT ——, 630 F.Supp. 1327 (1986). In *Timken,* the court held that ITA had abused its discretion by failing to obtain updated information for an annual review made pursuant to 19 U.S.C. § 1675 (1982). 10 CIT at ——, 630 F.Supp. at 1332–40. Defendant argues that *Timken* should not be applied to the facts of this case because the data at issue in *Timken* were much less current than the data in this case. In *Timken* the period of investigation ended 18 months

---

**17.** Defendant's argument implies an additional concern, that in cases involving cross-cumulation, some final injury determinations could be based, in part, on subsidized imports for which no independent final injury determination had been made. Again, this argument strikes beyond the issue of cross-cumulation, to the point of invalidating present practice. Under current law, ITC often cumulates imports that are not subject to existing final antidumping or countervailing duty orders; this occurs everytime a number of countries are before ITC in the same proceeding. In all cases involving non-mandatory cumulation decisions, ITC must examine and compare relevant conditions of trade for each set of imports. Because subsidized imports from non-signatory countries must face such an inquiry in a cross-cumulation case, no greater or lesser burden on the rights of other countries to a lawful injury determination is imposed.

**18.** Of course, if ITC determines that imports from Argentina even when analyzed separately caused injury to the U.S. industry, it need not address the issue of cumulation on remand.

prior to the preliminary determination and 2½ years prior to the final determination. In the case at bar, the capacity utilization data covered a period ending within 3 months of the preliminary determination and 13 months of the final determination. Defendant contends that if this investigation had proceeded according to a normal schedule, the final determination would probably have been rendered prior to January 1985.[19] Production capacity data for the entire 1984 year presumably would not have been available to ITC.

The court has noted that, although ITC generally focuses on annual time periods for the purpose of data analysis, it is not required by statute to use any particular time frame. *British Steel Corp. v. United States*, 8 CIT 86, 93–94, 593 F.Supp. 405, 411 (citing *American Spring Wire Corp. v. United States*, 8 CIT 20, 26, 590 F.Supp. 1273, 1279 (1984), *aff'd sub nom. ARMCO v. United States*, 760 F.2d 249 (Fed.Cir. 1985)). In light of ITC's broad discretion in setting time periods for the collection of data, the court has held that, under certain circumstances, ITC cannot be compelled to analyze data on a quarterly basis. *American Spring Wire Corp.*, 8 CIT at 26, 590 F.Supp. at 1279 (ITC was not required to base its findings on a quarterly analysis of the most recent data available, since analysis of quarter-by-quarter data would distort significant long term trends). *See also, British Steel Corp.*, 8 CIT at 94, 593 F.Supp. at 411 (an analysis of recent quarterly data would not have negated the significance of the increasing absolute volume of imports on a long term basis).

■ These decisions do not stand for the proposition that ITC has unbridled discretion in determining what data to collect in an investigation. The court repeatedly has held that ITC must acquire all obtainable or accessible information on the economic factors necessary for its analysis. *Roquette Freres v. United States*, 7 CIT 88,

94 & n. 8, 583 F.Supp. 599, 604 & n. 8 (1984) (citing *Budd*, 1 CIT at 75, 507 F.Supp. at 1003–04). Although ITC is not required to amass every conceivable shred of relevant data in order to comply with the requirements of the law, the absence of information necessary for a thorough analysis may render a determination unsupported by substantial evidence. *Kenda Rubber Industrial Co., Ltd. v. United States*, 10 CIT ——, 630 F.Supp. 354, 358 n. 4 (1986).

■ In this case, ITC's failure to request production capacity data for 1984 prevented it from performing a thorough analysis on the question of material threat. Although the data at issue in this case are, perhaps, less "stale" than the data in *Timken*, their currency is no less vital to a proper resolution of this case. The year-to-year volatility of the Argentine cold-rolled steel industry is well evidenced by the data compiled by ITC. Capacity utilization figures for the Argentine industry reflected substantial yearly changes from 1981 to 1983, and information presented by plaintiff in its pre-hearing brief suggested that a substantial decline was occurring in 1984. Plaintiff's prehearing brief also provided the ITC with evidence of the closure of other possible Argentine export markets and Argentina's need to generate U.S. dollars for debt repayment. Although much of this information was contained in newspaper articles and industry journals, plaintiff cannot reasonably be expected to produce precise production data, which is often held in strict confidence. The information provided by plaintiff should have put ITC on notice that it might be facing vastly different industry circumstances. In its final report, the ITC staff updated statistics to include information on the quantity and pricing of Argentine imports in the U.S. market. ITC should have pursued a similar course of action with respect to the data provided by Argentine producers.[20]

**19.** These proceedings were interrupted by voluntary restraint agreement negotiations between the United States and the subject countries.

**20.** At the final hearing, one commissioner recognized the importance of securing more recent data from the parties to the proceeding and asked the ITC staff to follow up on this problem. ITC transcript at 44–45. Nothing in the administrative record indicates that foreign pro-

■ Defendant still contends, however, that the plaintiff waived its right to make this objection when it failed to request more current data at an earlier stage in the administrative proceedings. *Kokusai Electric Co. v. United States,* 10 CIT ——, 632 F.Supp. 23 (1986). In *Kokusai,* the court refused to allow the plaintiff to raise the issue of whether certain subassemblies were properly within the scope of ITA's investigation, when it had not raised the issue prior to the time ITA closed its investigation. 10 CIT ——, 632 F.Supp. at 28.

There are compelling reasons why the principle set forth in *Kokusai* should not be applied to this case. The court has held that the burden of ensuring up-to-date review in section 1675 proceedings before ITA should not rest upon a domestic party. *Timken,* 10 CIT at ——, 630 F.Supp. 1333. Similarly, in this case, the responsibility for making up-to-date findings rests with ITC; it cannot precondition meaningful review upon specific requests for information by the parties. Furthermore, in the instant case, plaintiff presented evidence that prior data were no longer accurate, and ITC itself publicly asked its staff to provide more up-to-date data for the final determination. Under these circumstances it would be particularly inequitable to bar plaintiff's objection. In light of these facts and the importance of the capacity utilization data to this case, it is necessary to remand this issue to ITC for further consideration.

This matter is hereby remanded to the International Trade Commission for further consideration consistent with this opinion. ITC shall file its decision on remand within 45 days hereof. Plaintiff will have 15 days from filing to respond. Defendants may reply within 10 days thereafter.

SO ORDERED.

---

ducers were actually asked to update their capacity utilization data, and defendant-intervenor specifically denies that such a request was made. Response Brief of Defendant-intervenor Propulsora at 33. Because the court concludes that ITC erred in failing to collect and consider 1984 Argentine capacity utilization data, it does not reach the question of whether 1983 production capacity data, or the submissions contained in plaintiff's post-hearing brief, constituted the "best information available" under 19 U.S.C. § 1677e(b) (1982).