**Slip Op. 99-117**

## UNITED STATES COURT OF INTERNATIONAL TRADE

———————————————————————— :
                                              :
TA CHEN STAINLESS STEEL                       :
    PIPE, Ltd.,                               :
                                              :
        Plaintiff,                        :
                                              :
        v.                                :   Court No. 97-08-01344
                                              :
THE UNITED STATES,                            :   Public Version
                                              :
        Defendant,                        :
                                              :
    and                                       :
                                              :
AVESTA SHEFFIELD, Inc., et. al.,              :
                                              :
        Defendant-Intervenors.            :
———————————————————————— :

[Antidumping determination remanded.]

Dated: October 28, 1999

    Ablondi, Foster, Sobin & Davidow, p.c. (Joel Davidow and Peter Koenig) for plaintiff.

    David W. Ogden, Acting Assistant Attorney General, David M. Cohen, Director, Velta A. Melnbrencis, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (Mark L. Josephs), Christine Savage, Office of the General Counsel, United States Department of Commerce, of counsel, for defendant.

    Collier, Shannon, Rill & Scott, PLLC, (David A. Hartquist, Jeffrey S. Beckington, and Kathleen W. Cannon) for defendant-intervenors.

## OPINION

**RESTANI, Judge:**  This matter is before the court on a motion for judgment upon the agency record pursuant to USCIT Rule 56.2.  Ta Chen Stainless Steel Pipe, Inc. ("Ta Chen" or "plaintiff") challenges certain aspects of an antidumping duty determination by the Department of Commerce ("Commerce" or "the Department").  See Certain Welded Stainless Steel Pipe from Taiwan, 62 Fed. Reg. 37,543 (Dep't Commerce 1997) (final results of admin. rev.) [hereinafter "Final Results"].  Avesta Sheffield Inc., Damascus Tube Division, Damascus-Bishop Tube Co., and United Steelworkers of America (AFL-CIO/CLC) appear as defendant-intervenors (collectively "Defendant-Intervenors" or "Domestic Interested Parties") to Ta Chen's motion.

In 1992, Commerce determined that welded stainless steel pipe ("WSSP") from Taiwan was being sold at less than fair value, and accordingly issued an antidumping order.  Certain Welded Stainless Steel Pipe from Taiwan, 57 Fed. Reg. 62,300 (Dep't Commerce 1992) (amended final determination and antidumping duty order).  In December 1995, Commerce published its notice of opportunity to request an administrative review of the dumping order for the third administrative review period, covering December 1, 1994 through November 30, 1995.

Antidumping or Countervailing Duty Order, Finding, or Suspended Investigation, 60 Fed. Reg. 62,070, 62,071 (Dep't Commerce 1995).  Ta Chen requested a review and Commerce initiated an antidumping duty administrative review of WSSP on February 1, 1996.  Initiation of Antidumping and Countervailing Duty Administrative Reviews, 61 Fed. Reg. 3,670, 3,671 (Dep't Commerce 1996).

Ta Chen received a dumping margin of 6.06 percent, which was based on partial adverse facts available.  Final Results, 62 Fed. Reg. at 37,556.  Ta Chen challenges several aspects of the determination leading to the application of adverse facts.

**Jurisdiction and Standard of Review**

The court has jurisdiction pursuant to 28 U.S.C. § 1581(c) (1994).  In reviewing final determinations in antidumping duty investigations, the court will hold unlawful those agency determinations which are unsupported by substantial evidence on the record, or otherwise not in accordance with law.  19 U.S.C. § 1516a(b)(1)(B)(i) (1994).

## I.        Ta Chen's affiliation with Sun Stainless

### Background

Ta Chen is a Taiwanese producer of stainless steel pipe. In its Final Results, Commerce concluded that, pursuant to 19 U.S.C. § 1677(33) (1994), Ta Chen was affiliated with one of its US distributors, Sun Stainless, Inc. ("Sun"), on the grounds of control.[1]  Final Results, 62 Fed. Reg. at 37,549. Ta Chen disputes this finding and claims it is not affiliated with Sun.

In its first questionnaire, Commerce asked Ta Chen to list all companies affiliated with it, through stock ownership or otherwise.  Initial Questionnaire (Feb. 13, 1996), at A-4, P.R. Doc. 6, Def.'s App., Tab 1, at 6.  The definition of "affiliated person" in the questionnaire's glossary of terms simply restated the statutory definition.  Id. at App. I, Def.'s App., Tab 1, at 10.  The questionnaire also stated that

---

[1]      The name of Sun Stainless was confidential during the administrative proceedings, as was the name San Shing (dba "Sun Stainless"), Sun's predecessor.  Ta Chen placed Sun Stainless' name on the public record for these proceedings. See Pl.'s Br. at 3 n.6.  Ta Chen has since placed San Shing's name on the public record for the final results of the first and second administrative review.  See Certain Welded Stainless Steel Pipe from Taiwan, 64 Fed. Reg. 33,243, 33,243 (Dep't Commerce 1999) (final results of admin. rev.)
     In the Final Results, San Shing is referred to as Company A and Sun is referred to as Company B.

Ta Chen should seek clarification from the Department if it was uncertain whether a company was an affiliate.  Id. at G-6, Def.'s App., Tab 1, at 5. Commerce also asked Ta Chen to identify its sales as either export price ("EP") or constructed export price ("CEP").[2]  Id. at C-8, Def.'s App., Tab 1, at 7.  In its response, Ta Chen listed several affiliates, but did not include Sun.  See Response to Initial Questionnaire (Apr. 30, 1996), at 7-8, C.R. Doc. 1, Def.'s App., Tab 2, at 4-5.  Ta Chen said that none of its affiliates sold Ta Chen pipe in the United States or Taiwan during the 1994-95 period of review ("POR"), and that none of these affiliates were involved in any aspect of the production of pipe.  Id. at 8, Def.'s App., Tab 2, at 5.  Ta Chen also stated that its US pipe sales were EP sales, and not CEP sales, because the price and quantity for US sales was determined before the pipe was imported into the United

---

[2]    Commerce generally calculates the antidumping duty by comparing an imported product's price in the United States to its normal value ("NV"), which represents the price of comparable merchandise in the exporting country.  The dumping margin is the amount by which NV exceeds the US price.  See 19 U.S.C. § 1673 (1994).
     The US price is calculated as either EP or CEP.  See 19 U.S.C. § 1677a (1994).  Usually, EP is used when the foreign exporter sells directly to an unrelated US purchaser, and CEP is used when the exporter sells through a related party in the United States which performs substantial selling functions. See 19 U.S.C. § 1677a(a)-(b).

States.  Id. at 4, Def.'s App., Tab 2, at 2.  Ta Chen said that its wholly-owned US subsidiary, Ta Chen International ("TCI"), performed no function in connection with Ta Chen's US pipe sales, other than processing paper work.  Id.  Ta Chen stated that pipe did not enter a TCI warehouse in the US, but was shipped directly from Ta Chen in Taiwan to the customer in the United States.  Id.

In its first supplemental questionnaire, Commerce requested further information on a variety of issues, including a request that Ta Chen explain its relationship with Sun.  First Supplemental Questionnaire (Oct. 22, 1996), at 7, C.R. Doc. 6, Def.'s App., Tab 3, at 3.  Ta Chen responded that it had a history of doing business with Sun Stainless, and with San Shing.  Response to First Supplemental Questionnaire (Nov. 12, 1996), at 34, C.R. Doc. 8, Def.'s App., Tab 4, at 2. Both companies had been distributors of Ta Chen pipe.  Id.  Ta Chen said that in answering Commerce's questions regarding Sun, it assumed that Commerce was seeking information to determine whether Ta Chen and Sun were affiliates.  Id. at 35-36, Def.'s App., Tab 4, at 3-4.  Prior to describing its relationship with Sun, Ta Chen included much legal argument in its response regarding the statutory and regulatory definitions of "related party" and "control."  Id. at 36,

Def.'s App., Tab 4, at 4.  Ta Chen focused on the amendments

made to these definitions in the Uruguay Round Agreements Act

("URAA"), Pub. L. 103-465, 108 Stat. 4809 (1994), effective

January 1, 1995, and argued that Commerce should apply the

pre-URAA statutory definition of related parties because the

only sales Ta Chen had made to Sun in the third administrative

review period occurred in August 1994.[3]  Id. at 40-41, Def.'s

App., Tab 4, at 8-9.  Ta Chen does not pursue this argument

before the court.

Ta Chen went on to describe a long history with San Shing

and Sun Stainless.  It described several connections between

the companies which are listed in the Final Results as

follows:-

!    Sun was established by current or former managers and
     officers of Ta Chen;

!    Sun was staffed by current or former Ta Chen employees;

!    Sun distributed only Ta Chen products in the United
     States;

---

[3]     The Department verified that after August 1994, Ta
Chen had made no sales to Sun, but it had made shipments to
Sun, which were imported during the POR in January 1995.
Verification Report (June 19, 1997), at 4, C.R. Doc. 30,
Def.'s App., Tab 8, at 4; Response to First Supplemental
Questionnaire, at 41, Def.'s App., Tab 4, at 9.
     The period of review covers entries, as well as exports
or sales, made during the 12 month period at issue.  See 19
C.F.R. § 353.22(b) (1996) & 19 C.F.R. § 351.213(e)(1)(i)
(1999).

!   TCI had physical custody of Sun's signature stamp;

!   TCI had a dedicated computer connection to Sun's records
    for purposes of credit monitoring;

!   Ta Chen's president met with Sun's customers and
    participated directly in the negotiation of prices of
    Sun's resales of WSSP; and

!   Sun offered its accounts receivable and inventory as
    collateral for a bank loan to TCI.

Final Results, 62 Fed. Reg. at 37,549.  Ta Chen did not

provide the Department with information on Sun's US sales in

response to the first supplemental questionnaire.

In its second supplemental questionnaire, Commerce asked

a series of follow-up questions regarding Ta Chen's

relationship with Sun.  Commerce wanted to know if Sun bought

subject merchandise from any other companies, if any other

companies had access to Sun's records, and further detail on

Ta Chen's credit monitoring of Sun.  Second Supplemental

Questionnaire (Dec. 24, 1996), at 2-3, C.R. Doc. 15, Def.'s

App., Tab 5, at 4-5.  In this supplemental questionnaire

Commerce did not ask Ta Chen to supply information on Sun's US

sales, nor did it do so at any later point.  Commerce also

said that it had "made no determination in the first, second

or third administrative reviews as to the proper

classification of Ta Chen's U.S. sales."  Id. at 3, Def.'s

App., Tab 5, at 5.

When Commerce issued its Preliminary Results in January

1997, three days before Ta Chen responded to the second

supplemental questionnaire, the Department preliminarily

determined that an application of facts available was

warranted for Ta Chen's US sales to Sun because Ta Chen had

misreported this portion of its US sales as EP, instead of CEP

sales.  Certain Welded Stainless Steel Pipe from Taiwan, 62

Fed. Reg. 1,435, 1,435 (Dep't Commerce 1997) [hereinafter

"Preliminary Results"].  Commerce said that the additional

information provided by Ta Chen clearly indicated that Sun and

Ta Chen were affiliates pursuant to 19 U.S.C. § 1677(33)(G),

because Ta Chen was in a position to control Sun, and that

therefore Ta Chen's sales to Sun should have been classified

as CEP sales.

In its response to the second supplemental questionnaire,

Ta Chen answered Commerce's further questions about Sun.  In

particular, Ta Chen said that it had no reason to believe that

Sun purchased WSSP from any one other than Ta Chen.  Response

to Second Supplemental Questionnaire (Jan. 13, 1997), at 9,

C.R. Doc. 17, Def.'s App., Tab 6, at 2.  Ta Chen also stated

that it was not aware of any other company having computer

access to Sun's records, and that Ta Chen did not have such access to other customers. Id. Ta Chen did not provide information on Sun's US sales at this point, nor did it do so at any other time.

Commerce conducted a verification of Ta Chen's US sales data at TCI's premises in Long Beach, California on June 11 and 12, 1997. Verification Report, at 1, Def.'s App., Tab 8, at 1. Commerce issued the Final Results on July 14, 1997, and maintained its preliminary determination that Ta Chen was affiliated with Sun. Commerce calculated a margin based on partial adverse facts available, and applied the adverse inference only to a portion of Ta Chen's sales; i.e. the sales to Sun and to Anderson Alloys (see infra for discussion of Anderson). Final Results, 62 Fed. Reg. at 37,553. Ta Chen contests Commerce's conclusion that it is affiliated with Sun.

## Discussion

Section 1677(33) of Title 19 sets out a list of persons who will be considered affiliated, including "Any person who controls any other person and such other person . . . . [A] person shall be considered to control another person if the person is legally or operationally in a position to exercise restraint or direction over the other person." 19 U.S.C. § 1677(33)(G).

The Statement of Administrative Action also states that "control" exists "if one person is legally or operationally in a position to exercise restraint or direction over another person."  Statement of Administrative Action, accompanying H.R. 103-5110 at 168 (1994), reprinted in 1994 U.S.C.C.A.N. 3773, 4174 ("SAA").[4]  The SAA explains that this definition of control is a shift from the prior definition.

> The traditional focus on control through stock ownership fails to address adequately modern business arrangements, which often find one firm "operationally in a position to exercise restraint or direction" over another even in the absence of an equity relationship.  A company may be in a position to exercise restraint or direction, for example, through corporate or family groupings, franchises or joint venture agreements, debt financing, or close supplier relationships in which the supplier or buyer becomes reliant upon the other.

SAA at 168, 1994 U.S.C.C.A.N. at 4174-75.

Commerce's regulations adopted the statutory definition of "affiliated persons."  See 19 C.F.R. § 351.102(b) (1999) ("Affiliated persons" and "affiliated parties" have the same meaning as in section 771(33) of the Act [19 U.S.C. §

---

[4]     The Statement of Administrative Action represents "an authoritative expression by the Administration concerning its views regarding the interpretation and application of the Uruguay Round Agreements . . . . The Administration understands that it is the expectation of the Congress that future Administrations will observe and apply the interpretations and commitments set out in this statement." SAA at 1, 1994 U.S.C.C.A.N. at 4040.

1677(33)].")  In its Notice of Proposed Rulemaking, Commerce explained that "affiliated persons" is a new term, and declined to elaborate on the meaning of either "control" or "affiliated persons."  Antidumping Duties; Countervailing Duties, 61 Fed. Reg. 7,308, 7,310 (Dep't Commerce 1996) (notice of proposed rulemaking and request for public comments) (proposed regulations to conform to the URAA).  In its final rules, Commerce said it would not find that control existed on the basis of "corporate or family groupings; franchise or joint venture agreements; debt financing; and close supplier relationships . . . unless the relationship has the potential to impact decisions concerning the production, pricing or cost of the subject merchandise."  Antidumping Duties; Countervailing Duties, 62 Fed. Reg. 27,296, 27,380 (Dep't Commerce 1997) (final rules) ["Final Rules"].[5]  In the comments to these rules, however, Commerce specifically declined to provide further detail on the new affiliation or

_____

    [5]    This rule was codified at 19 C.F.R. § 351.102. These regulations, implemented to conform to the URAA, became applicable as of July 1, 1997.  See Final Rules, 62 Fed. Reg. at 27,417.  For reviews such as the third administrative review period for Ta Chen, initiated after January 1, 1995 but before the rules came into effect, the Department stated that the final rules would "serve as a restatement of the Department's interpretation of the requirements of the Act as amended by the URAA." Id.

control standard, stating that it was "more appropriate" for
Commerce to develop its practice regarding affiliation
"through the adjudication of actual cases."  Id. at 27,297.
The Department stated that it agreed that it should focus on
"relationships that have the potential to impact decisions
concerning production, pricing or cost," but that this did not
mean that "proof is required that a relationship in fact has
had such an impact."  Id. at 27,297-98.

**A)   Ta Chen's connections with Sun Stainless**

Ta Chen argues that none of its connections with Sun
placed it in a position to impact Sun's decisions concerning
the pricing of WSSP and, therefore, that Ta Chen and Sun
should not be considered affiliated parties.

1)   Ta Chen and Sun's historical ties

The Department found that Sun was established by current
or former managers and officers of Ta Chen, "at Ta Chen's
behest."  Final Results, 62 Fed. Reg. at 37,549.  Frank
McLane,[6] a member of Ta Chen's board of directors,
incorporated Sun Stainless in the fall of 1993.  Response to

---

        [6]    Frank McLane's name was considered confidential
during the third administrative review period, but was
subsequently placed on the public record in the final results
of the first and second administrative review.  See Certain
Welded Stainless Steel Pipe from Taiwan, 64 Fed. Reg. at
33,244.

First Supplemental Questionnaire, at 55, Def.'s App., Tab 4, at 22.  Sun became operational in November 1993, and Mr. McLane resigned from Ta Chen's board and sold his Ta Chen stock before Sun "began dealing with Ta Chen."[7]  Id.  A former TCI sales consultant, Ken Mayes,[8] was principal in charge of San Shing at the time San Shing took over TCI's inventories and pipe distribution in 1992, and was retained as the principal in charge of Sun Stainless when Sun bought out San Shing.  Id. at 50-56, Def.'s App., Tab 4, at 18-23.  Commerce concluded that "given the longstanding and intimate business dealings between [Ken Mayes] and the president of Ta Chen, we must question the degree of operational autonomy of [San Shing] and [Sun] while under this individual's stewardship." Final Results, 62 Fed. Reg. at 37,549.

Ta Chen argues that even if it had a historical affiliation with Sun, the fact that parties were previously

---

[7]     The Government states that Mr. McLane did not sell his Ta Chen stock and resign from the board until after the incorporation of Sun.  Gov't Br. at 22-23.  The exact dates, however, are unclear from the record.  See Response to First Supplemental Questionnaire, at 55-56, Def.'s App., Tab 4, at 22-23.

[8]     Ken Mayes' name was also considered confidential during the third administrative review period, but was placed on the public record for the final results of the first and second administrative review.  See Certain Welded Stainless Steel Pipe from Taiwan, 64 Fed. Reg. at 33,244.

affiliated is irrelevant to the question of whether they are currently affiliated. See Certain Iron Construction Castings from Canada, 55 Fed. Reg. 460, 460 (Dep't Commerce 1990) (final results of antidumping duty admin. rev.) (fact that respondent sold its interest in possible related party prior to initiation of review was one reason, among others, that ITA declined to make a finding of relatedness). Certainly the existence of a prior affiliation should not be dispositive in making a determination regarding current affiliation. Ken Mayes' intimate knowledge of TCI and Sun's operations may have called into doubt the operational autonomy of San Shing and Sun, but this factor alone does not constitute substantial evidence that Ta Chen controlled either San Shing or Sun. Likewise, the details of Frank McLane's relationship with Ta Chen at the time he incorporated Sun are unclear from the record, and are insufficient to support a finding of affiliation.

2)  Staffing of Sun by current or former Ta Chen employees

Commerce found that Sun was staffed entirely by current or former employees of Ta Chen. Final Results, 62 Fed. Reg. at 37,549. Ta Chen disputes this conclusion and says that no individuals were employed by Ta Chen and Sun at the same time. Pl.'s Br. at 53.

Regarding allegedly common clerical staff, Ta Chen argues that it had a surplus of clerical staff when TCI gave up its US inventory sales business. Ta Chen says that some of these individuals were hired by Sun. Id. at 54-55. Ta Chen admits that it did provide Sun with some "routine clerical assistance and training, use of office equipment, suggestions on working with customs brokers, training on shipping procedures, and data entry and bookkeeping type assistance." Id. at 55. The staff who provided such assistance allegedly were never employees of Sun, but rather acted on Ta Chen's behalf for Ta Chen's benefit.

Ta Chen argues in this regard that the movement of employees is irrelevant to the question of whether companies are affiliates. See Oil Country Tubular Goods from Argentina, 60 Fed. Reg. 33,539, 33,544 (Dep't Commerce 1995) (final determination of sales at LTFV) (finding that a common employee/consultant is "not the same thing as board membership and is not enough to establish control"); see also Certain Fresh Cut Flowers from Mexico, 56 Fed. Reg. 1,794, 1,799 (Dep't Commerce 1991) (final results of antidumping duty admin. rev.) (shared address, phone number, and invoice forms of two foreign importers not sufficient to lead to finding of relatedness).

The Department also considered that Ken Mayes had been a common employee of Ta Chen and Sun, and that he had received compensation from Ta Chen after the end of his employment with Ta Chen in 1992. Final Results, 62 Fed. Reg. at 37,549. Ta Chen counters that Ken Mayes was an independent contractor with Ta Chen, and that he had been at liberty to work for others even while he was retained by Ta Chen. Pl.'s Br. at 53. Moreover, Ta Chen states that Ken Mayes' independent contractor agreement terminated prior to his employment with San Shing and Sun. Id. Ta Chen says that the payment to Ken Mayes was not made until Mayes had left Sun, and that this sum represented a one time payment which Ta Chen owed Ken Mayes pursuant to their earlier contract. Id. at 54. The Department has previously stated that the right to a one-time profit sharing conveys no ownership right or control in a company. See Porcelain-on-Steel Cookware from Mexico, 62 Fed. Reg. 25,908, 25,914 (Dep't Commerce 1997) (final results of antidumping duty admin. rev.) (Department included respondent's profit-sharing expenses in COP analysis as an expense, but distinguished these expenses from dividends, because "right to participate in profit-sharing conveyed no ownership right in [respondent company]"). Accordingly,

Mayes' right to a payment by Ta Chen by itself does not suffice to establish a control relationship.

The Government argues that the history of common personnel supports the conclusion that Ta Chen had the ability to exercise "operational direction or restraint" over Sun. Gov't Br. at 23-24.  In light of Oil Country Tubular and Certain Fresh Cut Flowers, however, it is unlikely that the existence of common clerical staff could, on its own, suffice to support the Department's finding of control.  This is particularly so here because Commerce did not articulate how Ta Chen could have used the alleged common staff to direct or restrain Sun.

3)   Sun's distribution of only Ta Chen products

Another of the Department's reasons for concluding that Ta Chen and Sun were affiliates was the fact that Sun distributed only Ta Chen products in the United States.  Final Results, 62 Fed. Reg. at 37,549.  The Department reasoned that this was akin to a close supplier relationship, which is a factor specifically mentioned in both the SAA and the Department's regulations as indicative of control.  Ta Chen argued before Commerce, as it does here, that although Sun bought all of its stainless steel pipe from Ta Chen, Sun was

at liberty to buy from other producers.  Final Results, 62
Fed. Reg. at 37,550; Pl.'s Br. at 51.

Ta Chen says there was no exclusivity agreement with Sun.
Further, it argues that even in the presence of such exclusive
agreements, Commerce recognizes that such contracts are
"common commercial arrangements," and that affiliated party
status does not necessarily arise from a customer buying all
of its product from one supplier.  See Certain Cold-Rolled and
Corrosion- Resistant Carbon Steel Flat Products from Korea, 62
Fed. Reg. 18,404, 18,441 (Dep't Commerce 1997) (final results
of antidumping duty admin. revs.) (respondent did not control
the home-market distributor because there was no evidence that
distributor entered into exclusive sales contract other than
voluntarily, or that the contract could not be terminated by
either party).  In Open-End Spun Rayon Singles Yarn from
Austria, 62 Fed. Reg. 43,701 (Dep't Commerce 1997) (notice of
final determination of sales at LTFV), the Department did not
find that the respondent and its sole US customer of subject
merchandise were affiliates.  The Department reasoned that
because the respondent's records showed that its US customer's
purchases "account for only a small portion of [respondent's]
total sales revenue," the respondent was not reliant on this
US customer.  62 Fed. Reg. at 43,708.

Commerce responds that a finding of affiliation can be based on a close supplier relationship alone.  The Government cites  Stainless Steel Wire Rod from Korea, 63 Fed. Reg. 40,404 (Dep't Commerce 1998) (notice of final determination of sales at LTFV), where the Department found that the sole supplier, and the sole buyer, of the major input for the production of the subject merchandise were affiliated because the supplier was in a position to control the buyer.  63 Fed. Reg. at 40,410.  The buyer, by its own admission, had been unable to develop an alternate source to supply the input. "Thus, the business and economic reality is that the relationship between the parties is significant and, as demonstrated by evidence on the record, not easily replaced." Id.; see also Mitsubishi Heavy Indus., Ltd. v. United States, 54 F. Supp.2d 1183, 1190-91 (Ct. Int'l Trade 1999) (sustaining Commerce's determination that "any supplier that depended upon [buyer] for 50 percent or more of its sales during each year during a five year period [would] be potentially subject to the restraint or direction of [the buyer]" was reasonable interpretation of term "close-supplier"); but cf. Furfuryl Alcohol from the Republic of South Africa, 62 Fed. Reg. 61,084, 61,086 (Dep't Commerce 1997) (final results of antidumping duty admin. rev.) (producer and seller not

affiliated with its home market customers even though producer was the only manufacturer of subject merchandise in South Africa; Department stated that producer's dominant position in the home market "in and of itself" was not sufficient for a finding of affiliation between producer and its customers).

Given the inclusion of close-supplier relationships in the SAA and the Department's regulations, Commerce's decision to consider the fact that Sun purchased WSSP exclusively from Ta Chen as one factor, among others, as demonstrating Ta Chen's ability to control Sun, was reasonable. Moreover, the determinations Ta Chen cites in support of its position that exclusive sales agreements and close supplier relationships are not sufficient to lead to a finding of affiliation did not involve as many connections between the companies as Commerce found between Ta Chen and Sun. If the affiliation finding hinged on this factor alone, however, the court would be reluctant to uphold the determination as based on substantial evidence. In this case there was no exclusive sales contract, and even when there are exclusive sales contracts, Commerce has found that insufficient for an affiliation finding. See Certain Cold-Rolled Carbon Steel Flat Products, 62 Fed. Reg. at 18,441. When the court upheld Commerce's determination based on the "greater-than-fifty-percent-sales-dependence-for-

five years" in <u>Mitsubishi</u>, the court noted that the subject

merchandise was a "highly customized product, requiring unique

technical specifications."  <u>Mitsubishi</u>, 54 F. Supp.2d at 1191.

By contrast, there is no suggestion in this case that Sun

would have had difficulty obtaining WSSP from other suppliers.

Nonetheless, this is one factor that may be considered by

Commerce.

4)   <u>TCI's custody of Sun's signature stamp</u>

Commerce stated that TCI's physical custody of Sun's

signature stamp constituted <u>prima facie</u> evidence that Ta Chen

either "exercised, or was in a position to exercise, control

over [Sun's] disbursements."  <u>Final Results</u>, 62 Fed. Reg. at

37,549.  Ta Chen argues against the Department's conclusion

regarding this stamp, stating that TCI had this stamp in order

to monitor Sun's cash outflows.  Pl.'s Br. at 58.  Ta Chen

further states that it sold Sun a large volume of product on

extended payment terms, and that therefore TCI's accounts

receivable from Sun "came to be one of TCI's most significant

assets."  <u>Id.</u>  Ta Chen says "it was precisely because Ta Chen

did not control Sun that stringent credit monitoring measures

were sought.  The monitoring could provide early warning of

cash flow problems which could adversely affect ability to pay

debt."  <u>Id.</u> at 58-59.

Commerce considered Ta Chen's arguments regarding the reasons why it possessed Sun's signature stamp and concluded that Ta Chen had not presented evidence to counter the presumption that it was in a position to control Sun's disbursements. Final Results, 62 Fed. Reg. at 37,549. Ta Chen says TCI only stamped checks which were pre-approved by Sun, and that Sun could write its own checks. Pl.'s Br. at 58. There is no discussion, however, of whether Ta Chen had the right to withhold stamping Sun checks. There is also no record evidence of a written agreement between Ta Chen and Sun regarding Ta Chen's use and possession of Sun's stamp. Possession of the signature stamp provided TCI with the means to control Sun's outflows, whether TCI exercised that power or not. The statute focuses on the capacity to control, rather than on the actual exercise of control. See Ferro Union, Inc. v. United States, 44 F. Supp.2d 1310, 1324 (Ct. Int'l Trade 1999) (determination of "control" under URAA "not dependent on actually exercising control, but rather on the capacity to exercise control") (emphasis in original). The court therefore concludes that the Department's reasoning that possession of the signature stamp provided Ta Chen with the capacity to control Sun's disbursements was substantially supported.

5)   <u>Ta Chen's credit monitoring of Sun</u>

The Department also considered as indicative of control the fact that Ta Chen, through TCI, had a dedicated computer connection to Sun's accounts receivable, accounts payable, and inventory.  This access was on a full-time, unlimited basis, which required no passwords or other security mechanisms limiting Ta Chen's access to Sun's records.  <u>Final Results</u>, 62 Fed. Reg. at 37,549; <u>Verification Report</u>, at 5, Def.'s App., Tab 8, at 5.

Ta Chen argues that its credit monitoring of Sun via TCI's possession of Sun's signature stamp was imperfect, and that therefore Ta Chen needed another way to monitor Sun's credit.  Pl.'s Br. at 59.  Ta Chen submitted a certified statement from an expert in the US steel industry who asserted that, in light of Sun's purchasing of a large volume of product on extended payment terms, the credit monitoring exercised by Ta Chen was not inappropriate between unaffiliated parties.  <u>Response to Second Supplemental Questionnaire</u>, at 41-42, C.R. Doc. 17, Pl.'s Prop. App., Tab C, at 15-16.  Ta Chen also notes a comment to UCC § 9-205 (1999) which says that "policing" or "dominion" by the secured

party of its unaffiliated debtor is permissible and expected.[9]

Ta Chen also alleges that Commerce's conclusion that Ta Chen's
computer access to Sun's records was indicative of control is
"speculative" because Commerce did not cite evidence as to why
unaffiliated parties would never agree to such credit
monitoring.

Ta Chen is misstating the Department's analysis of this
issue.  Commerce conceded that it is common for creditors to
"obtain reports regarding the status of a debtor's business
activities," but contended that the "full-time and unlimited
access to [Sun's] computer system afforded Ta Chen a far more
invasive mechanism for monitoring than would be expected
between unaffiliated parties."  Final Results, 62 Fed. Reg. at
37,549.  The court finds that Commerce did not base its
affiliation finding simply on the fact that Ta Chen monitored
Sun's records, but rather on the means with which Ta Chen
effectuated its monitoring.  Ta Chen's unlimited access to

_____

    [9]    Ta Chen is referring to an official comment to UCC §
9-205 which states that nothing in the section "prevents . . .
'policing' or dominion as the secured party and the debtor may
agree upon; business and not legal reasons will determine the
extent to which strict accountability, segregation of
collections, daily reports and the like will be employed."
Comment 5 to UCC § 9-205.
    A finding of affiliation, however, is not inconsistent
with secured status.  Whether such monitoring is legally
permissible is irrelevant to the affiliation determination.

Sun's accounts does seem highly invasive, and Commerce's conclusion that this monitoring was more invasive than the type which would normally exist between unaffiliated parties was substantially supported.

6)   Participation by Ta Chen president in meetings with Sun customers and negotiation of prices of Sun's resales of WSSP

The Department also focused on the fact that Robert Shieh, the president of Ta Chen, met with Sun's customers and participated in the negotiation of Sun's resales of WSSP, to conclude that Ta Chen and Sun were affiliates.  Final Results, 62 Fed. Reg. at 37,549.  Commerce found that "Ta Chen's statement that 'it knew the prices which would be accepted by [Sun]' raise[d] additional questions about the extent to which [Sun] was free to act in its own interest."  Id.

Ta Chen explains that when a customer wanted to buy WSSP at a price acceptable to Sun, Ta Chen would tell the customer to prepare a purchase order for Sun.  Pl.'s Br. at 48.  The customer would then either send its order directly to Sun, or give it to Ta Chen, who would forward the order to Sun.  Id. Ta Chen says Sun was free to accept, reject, or modify these orders.  Id.  Ta Chen submitted the testimony of a US steel industry expert to support its argument that such behavior by Ta Chen was standard industry practice.  Response to Second

Supplemental Questionnaire, at 44, C.R. Doc. 17, Pl.'s Prop.
App., Tab C, at 18.  This expert stated that mill officials
visit their unaffiliated distributors' customers and forward
the orders, so as not to undermine their distributors by
taking the order directly from the distributor's customers.
Id.

Ta Chen may be correct in arguing that Mr. Shieh's visits
to Sun's customers is standard industry practice.  Such visits
do, however, raise a well-founded suspicion that Ta Chen had a
great deal of access to Sun's pricing information.  For
instance, how could Ta Chen assure a seller that a particular
price was acceptable to Sun, unless Ta Chen had intimate
knowledge of Sun's pricing and cost decisions?  Moreover,
simply because certain behavior is standard industry practice
does not mean it negates a finding of control.  See Final
Rules, 62 Fed. Reg. at 27,298 (declining to adopt suggestion
that Department should not consider "normal commercial
relationships" as evidence of control; relationships described
in SAA as giving rise to control "can be characterized as
'normal' in the sense that they are commercial relationships
commonly entered into by firms.  Nevertheless . . . the SAA
indicates that they can give rise to control").  Mr. Shieh's
ability to set the prices for Sun's resales directly

implicates Ta Chen's ability to affect Sun's pricing decisions, in accordance with Commerce's regulatory definition of affiliated parties. See 19 C.F.R. § 351.102. The court therefore concludes that this factor was a strong indicator of Ta Chen's ability to control Sun.

7)   Debt financing

Commerce's decision that Sun and Ta Chen were affiliated also depended on the debt financing arrangement agreed to by Sun. See Final Results, 62 Fed. Reg. at 37,549. Commerce found that whether Sun "offered" its accounts receivable and inventory as collateral for a bank loan to TCI, or whether TCI requested that it do so, was not germane to its analysis. "Either way . . . [Sun] 'placed its continued ability to operate in the hands of a putatively unaffiliated party.'" Id. (quoting Preliminary Results, 62 Fed. Reg. at 1,436.)

In response to Commerce's first supplemental questionnaire, Ta Chen explained that in June of 1993, it sought to maintain a line of credit with its bank for an amount comparable to the amount of TCI's accounts receivable from San Shing.[10]  Response to First Supplemental

---

[10]   TCI's accounts receivable from San Shing were [    ] million and it sought a line of credit with its bank of [    ] million. Response to First Supplemental Questionnaire, at 57,
(continued...)

Questionnaire, at 57, Def.'s App., Tab 4, at 24.  Ta Chen says

that TCI consented to a UCC lien in all of its accounts

receivable, "a significant portion of which was owed by San

Shing."  Id.  In this response, Ta Chen suggested that in

order to obtain a more favorable interest rate, San Shing, and

subsequently Sun Stainless, provided the bank with the UCC

lien on its inventory and accounts receivable directly.  Id.

Ta Chen states that later TCI asked Sun to grant the lien

directly, as a way to "simplify a still otherwise ordinary

commercial arrangement."[11]  Pl.'s Br. at 63.  Ta Chen says that

the security lien was limited to the unpaid amount which Sun

owed Ta Chen for product sold, and that this limitation was

stated in side letter agreements.  Id.  The Final Results

state that the agreement between Ta Chen/TCI and Sun was not

in writing.  Ta Chen claims that the side letter agreements

_____

[10](...continued)
Def.'s App., Tab 4, at 24.

[11]    Ta Chen cites Commerce's determination in Polyvinyl
Alcohol from Taiwan, 62 Fed. Reg. 54,823 (Dep't Commerce 1997)
(notice of termination of new shipper review), as an example
of a customer granting a security interest in its accounts
payable to a supplier, without this constituting debt
financing that leads to a finding of affiliation.  The court
has trouble seeing how Ta Chen draws this conclusion from this
determination.  Commerce stated that the debt financing at
issue in Polyvinyl did not establish a control relationship,
but the particulars of the debt financing are not explained in
the determination.  See Polyvinyl, 62 Fed. Reg. at 54,824.

did exist, and stated at oral argument that these were available to the Department at verification, but that the verifiers chose not to look at them.  In its response to the supplemental questionnaire, however, Ta Chen specifically stated that it had been unable to find any written statement memorializing the terms of the agreement, but that "the amount of the TCI take down on its line of credit was to be, and always was, less than the amount owed to TCI by [San Shing or Sun]."  Response to First Supplemental Questionnaire, at 57-58, Def.'s App., Tab 4, at 24-25.  The court is thus uncertain whether a written agreement did exist, but finds it unnecessary to resolve the issue.  The particulars of the debt financing suffice to support Commerce's conclusion that it was indicative of a control relationship.

Similar to its arguments regarding Robert Shieh's negotiations with Sun's customers, Ta Chen states that there was nothing unusual about this debt financing arrangement.[12]  Ta Chen also argues that the Department normally bases its understanding of the relationship between parties on how the

---

[12]    Ta Chen again provided Commerce with the opinion of a US steel industry expert who found that Ta Chen's method of securing payment from Sun was "a perfectly normal arrangement between unaffiliated parties."  Pl.'s Br. at 65-66; see also Response to Second Supplemental Questionnaire, at 41-42, Pl.'s Prop. App., Tab C, at 15-16.

parties themselves treat their relationship in their financial statements.  See Melamine Institutional Dinnerware Products from Taiwan, 62 Fed. Reg. 1,726, 1,731 (Dep't Commerce 1997) (notice of final determination of sales at LTFV) (where Department classified amounts as long-term loans "consistent with the treatment in the respondent's financial statement"). Because TCI's audited financial statements do not include a loan from Sun in its list of loan guarantees received from third parties, and because the auditors did not list Sun as an affiliated party in TCI's audited financial statements, Ta Chen argues that the Department should have deferred to this characterization of their relationship.  Pl.'s Br. at 66; see also Response to First Supplemental Questionnaire, at 69, Pl.'s Prop. App., Tab A, at 37.

Ta Chen overlooks the fact that the original debt financing agreement was entered into with Sun's predecessor, San Shing, and then apparently continued with Sun.  This gives rise to the question of why a new entity, Sun, would agree to take on such a risk with a putatively unaffiliated company. Ta Chen also minimizes aspects of the debt financing agreement which concerned Commerce.  Commerce explicitly disagreed with Ta Chen's argument that Sun's pledging of it accounts receivable and inventory to TCI "was essentially akin to TCI

securing a lien upon [Sun] and, in turn assigning its rights

to the bank." Final Results, 62 Fed. Reg. at 37,550.

Commerce explained:

> the actual transaction involved a significant qualitative
> difference. In the latter case, TCI's security interest
> would be limited to the amount [Sun] owed against
> purchases of inventory. In the former case, [Sun]
> unilaterally, and without consideration, assigned its
> entire inventory and accounts receivable directly to
> TCI's bank to facilitate a loan for TCI. That [Sun]
> would accept this risk without any consideration -
> without even a written agreement memorializing the terms
> and duration of the agreement – does not comport with the
> commercial realities of dealings between unaffiliated
> companies.

Id. Ta Chen argues that the consideration for Sun to enter

into the agreement was the extended payment terms Ta Chen gave

Sun on a large volume of product. From the record, however,

it appears that Sun had already obtained the favorable credit

terms prior to agreeing to this loan agreement. Indeed, Ta

Chen stated that a significant portion of its accounts

receivable, prior to seeking the loan, were owed to it by San

Shing as a consequence of Ta Chen's large volume of sales to

San Shing and the extended credit terms for payments.

Response to First Supplemental Questionnaire, at 56-57, Def.'s

App., Tab 4 at 23-24. The court therefore finds supported

Commerce's conclusion that Sun agreed to offer its inventory

and accounts receivable as collateral for TCI's loan without adequate consideration.

8)    <u>Factors considered as a whole</u>

The court finds that Commerce's determination that Ta Chen controlled Sun is supported by substantial evidence. Even if each of the individual connections between Ta Chen and Sun, standing alone, may not be sufficient to establish control, Commerce's conclusion that the numerous connections between Ta Chen and Sun were indicative of control was reasonable.  Commerce did not rely on any one factor in concluding that Ta Chen and Sun were affiliated parties, rather, it determined that the combination of factors was sufficient proof of affiliation.

Ta Chen argues that Sun paid competitive and negotiated prices for Ta Chen pipe, and that Sun was a profitable company which was sold for a profit.  Ta Chen argues that if it were really affiliated with Sun, it would not have sold WSSP to Sun at a lower price and that no one would have been interested in purchasing a company affiliated with another.  Pl.'s Br. at 47.  Commerce responded to this at oral argument by stating that Ta Chen could have been establishing Sun's future market. Although this response is not completely satisfactory, the possibility of drawing inconsistent conclusions from the

evidence does not render it unsupported by substantial evidence.  See Consolo v. Federal Maritime Comm'n, 383 U.S. 607, 620 (1966) ("possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence") (citations omitted).

Substantial evidence is "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Universal Camera Corp. v. NLRB, 340 U.S. 474, 477 (1951) (citation omitted).  Even if the  court, deciding the issue anew, concluded that Ta Chen and Sun were not affiliates, Commerce's determination would not be overturned "merely because the plaintiff 'is able to produce evidence . . . in support of its own contentions,'" rather, the plaintiff's evidence "must be enough to convince the Court that a reasonable mind would not have found [Commerce's] evidence sufficient to support its conclusion." Torrington Co. v. United States, 14 CIT 507, 513-14, 745 F. Supp. 718, 723 (1990) (quoting Hercules, Inc. v. United States, 11 CIT 710, 755, 673 F. Supp. 454, 490 (1987)).

Ta Chen's evidence is not sufficiently convincing for the court to conclude that a reasonable mind would not find Commerce's evidence sufficient to support the affiliation

finding.  Given the numerous financial connections and
opportunities for control between Ta Chen and Sun, and Ta
Chen's access to Sun's pricing information, as well as its
participation in the negotiation of Sun's sales of WSSP, the
court concludes that Commerce's determination that Ta Chen
controlled Sun was supported by substantial evidence.
Therefore, Commerce's determination that Ta Chen and Sun were
affiliated parties is sustained.

**B)   Failure to provide adequate notice**

The court does not find, however, that Commerce's
decision to apply facts available was made in accordance with
law.  Based on its affiliation finding, Commerce concluded
that Ta Chen's sales to Sun should be classified as CEP sales,
and applied an adverse facts available margin to these sales
because Ta Chen did not provide information on Sun's US sales.
The Department, however, never specifically requested this
information.  When Ta Chen learned that the Department would
classify its sales as CEP, the time for Ta Chen to place
unsolicited information on the record had passed.

Commerce argues that the questions in its original
questionnaire informed Ta Chen that, in general, it needed to
provide US sales information for its affiliated resellers.
Gov't Br. at 33-34.  This argument minimizes the fact that

Commerce specifically told Ta Chen in the second supplemental questionnaire that it had not yet decided how to classify Ta Chen's US sales. See Second Supplemental Questionnaire, at 3, Def.'s App., Tab 5, at 5. Commerce must have been aware when it issued this second supplemental questionnaire on December 24, 1996 that there was a possibility that it would treat Ta Chen and Sun as affiliates, given that it made such a determination in the Preliminary Results, issued two weeks later on January 10, 1997. Commerce could therefore foresee that in order to properly calculate Ta Chen's sales as CEP sales, it would need information on Sun's US sales. But Commerce did not ask for this information specifically. In fact, it appears to have tried to avoid giving Ta Chen a belated chance to amend.

Commerce has a statutory obligation to provide respondents with a chance to remedy deficient submissions. See 19 U.S.C. § 1677m(d) (1994). The statute provides in relevant part:

> If the administering authority or the Commission determines that a response to a request for information under this subtitle does not comply with the request, the administering authority . . . shall promptly inform the person submitting the response of the nature of the deficiency and shall, to the extent practicable, provide that person with an opportunity to remedy or explain the deficiency in light of the time limits established for

the completion of investigations or reviews under this subtitle.

Commerce did not provide Ta Chen with such a remedial opportunity to place information of Sun's US sales on the record in this review. Commerce implies that Ta Chen could have provided the information on Sun's US sales after the issuance of the preliminary results. Gov't Br. at 40. The time for Ta Chen to provide unsolicited information, however, had already passed. See 19 C.F.R. § 353.31(a)(ii) (1996) (submission of factual information to be submitted not later than "the earlier of the date of publication of notice of preliminary results of review or 180 days after the date of publication of notice of initiation of the review").[13] The initiation of the review in this case was published on February 1, 1996, which would have required Ta Chen to submit all factual information by August 1, 1996, six months before Ta Chen was informed that the Department would consider its sales to Sun as CEP sales.

---

[13] The current version of this regulation provides that submission of factual information is due no later than "[for] the final results of an administrative review, 140 days after the last day of the anniversary month, except that factual information requested by the verifying officials from a person normally will be due no later than seven days after the date on which the verification of that person is completed." 19 C.F.R. § 351.301(b)(2) (1999).

The failure by Commerce to provide respondents with sufficient notice can render the decision "unsupported by substantial evidence and otherwise contrary to law." Usinor Sacilor v. United States, 19 CIT 711, 745, 893 F. Supp. 1112, 1141-42 (1995) (Department failed to notify plaintiff that it lacked necessary information to assess likely effects of subsidy program in countervailing duty case; plaintiffs not aware of deficiency until issuance of final results), aff'd in part and rev'd in part, 1999 WL 641231 (Fed. Cir. Aug. 24, 1999). In Usinor, the court found that broad questions initially asked of plaintiff did not "discharge [Commerce] from its obligation to put parties on notice as to the deficiencies in their responses." Id. The court will not endorse "an investigation where [Commerce] sent out a general questionnaire and a brief deficiency letter, then effectively retreated into its bureaucratic shell, poised to penalize [respondent] for deficiencies not specified in the letter that [Commerce] would only disclose after it was too late, i.e., after the preliminary determination." Bowe-Passat v. United States, 17 CIT 335, 343 (1993).

Although Ta Chen, unlike the respondent in Bowe-Passat, did not try to provide the missing information after the preliminary results, Commerce has behaved in the same way as

it did in <u>Bowe-Passat</u> by failing to notify the respondent of the deficiency when it had an opportunity to do so, prior to issuing the preliminary results.  Commerce's preliminary determination that Ta Chen and Sun were affiliated, and its decision to apply an adverse margin because Ta Chen failed to provide information on Sun's US sales, does not constitute notice pursuant to 19 U.S.C. § 1677m(d).  Although it is not completely clear that the Department would have rejected the information had Ta Chen tried to submit it after the preliminary results, Commerce's less than open approach to Ta Chen indicates rejection was likely.  At oral argument, the government argued that Ta Chen was required to ask the Department to ask Ta Chen to provide Sun's US sales information.  But it is Commerce, not the respondent, which bears the burden of asking questions.  <u>See</u> <u>NSK Ltd. v. United States</u>, 19 CIT 1319, 1328, 910 F. Supp. 663, 671 (1995) ("[r]espondents should not be required to guess the parameters of Commerce's interpretation of a phrase in the statute.")

Commerce grounds its argument on the truism that the respondent has the burden of creating an accurate record.  <u>See</u> <u>Chinsung Indus. Co. v. United States</u>, 13 CIT 103, 106, 705 F. Supp. 598, 601 (1989) (burden of creating an adequate record rests with respondents).  This truism, however, cannot obviate

Commerce's obligation to let the respondent know what information it really wants.  See Queen's Flowers de Colombia v. United States, 981 F. Supp. 617, 628 (Ct. Int'l Trade 1997) ("alleged response deficiency cannot support application of [best information available] where the information sought was apparently never requested.") (citation omitted).

Commerce has an obligation to make the questions affected by affiliation issues clear, in light of its own recognition that affiliation is a complex concept and its decision to develop its practice in this area on a case by case basis.[14] See Final Rules, 62 Fed. Reg. at 27,297.  Commerce must therefore assure itself that it has asked questions sufficient to provide it with enough information to make both the affiliation determination itself and the resulting determinations.  In this case Ta Chen had a good basis to argue that it did not control Sun and it made that argument to

---

[14]    Commerce stated in the Final Results that by the time of this review, Ta Chen must have had an understanding of affiliation.  Final Results, 62 Fed. Reg. at 37,552.  Although the URAA went into effect in January 1995, Commerce did not issue its final regulations to comport with the new statute until 1997, and the third administrative review of Ta Chen began in 1996.  The court therefore cannot conclude that a respondent in Ta Chen's situation could be expected to have a thorough understanding of how Commerce would apply the new affiliation standard, where Commerce itself said that it would develop its affiliation practice, "through the adjudication of actual cases."  Final Rules, 62 Fed. Reg. at 27,297.

Commerce.  If a respondent reasonably believes it is not affiliated with its reseller, and therefore that it has EP rather than CEP sales, then it has a reason not to submit information on the subject reseller's US sales until Commerce tells the respondent that it wants the information on the particular reseller or until Commerce's questions are clear enough that the respondent knows what it should submit.[15]  In this situation where a new statute was not fully explained and Commerce suspected that it would make a finding of affiliation between the importer and the US reseller, it should have placed the respondent on notice, specifically requested information on that reseller's US sales, and requested any other information necessary to the CEP calculation.  If Commerce wishes to place the full burden of error of an affiliation assessment on the respondent, at a minimum it must make that clear, otherwise this is simply another instance of

---

[15]     Contrast this fact situation with that of respondent in Pohang Iron and Steel Co. v. United States, No. 98-04-00906, 1999 WL 970743, at *15 (Ct. Int'l Trade Oct. 20, 1999) (Commerce twice asked for specific information necessary to calculate CEP and respondent specifically declined to provide data on basis EP applied).

error which respondents must have an opportunity to correct

under 19 U.S.C. § 1677m(d).[16]

Commerce may not use Ta Chen's failure to submit Sun's US

sales information as justification for an application of

adverse facts available.  On remand, Commerce must provide Ta

Chen an opportunity to supply the information on Sun's US

sales.

## II.  Purported sales to Company C

### Background

In the Final Results, Commerce concluded that Ta Chen

failed to report commissions to one of its US customers,

Anderson Alloys,[17] on sales purportedly made to one of its US

---

[16]     Even if Commerce's procedures and questions are
clear, this may be insufficient to prevent Commerce from
having to provide a respondent with the opportunity to remedy
a deficient submission when it discovers the omission early
enough for remediation to occur.  Defendant made clear that it
was not arguing that the statute allows an exception to the
opportunity for correction provision based on inexcusable
neglect or wilful hiding of information.  This may be a defect
in the statute which Commerce is seeking to offset.  In any
case, as the requisite clarity was not present here, the court
does not address this issue.

[17]     Subsequent to the issuance of the Final Results, Ta
Chen placed the name, Anderson Alloys, on the public record.
See Pl.'s Br. at 3 n. 6.  In the Final Results, Anderson is
referred to as "one of Ta Chen's US customers."

Customers, Company C.[18]  <u>Final Results</u>, 62 Fed. Reg. at 37,544.

Commerce concluded that Ta Chen misreported an unknown number

of sales to this customer and decided to apply adverse facts

available to all of Ta Chen's sales made to Anderson.  <u>Id.</u>

Commerce stated that Ta Chen had not acted to the best of its

ability, and that Ta Chen's reported data did not permit

Commerce to segregate the misreported sales for purposes of

calculating the final margin.  <u>Id.</u>

Commerce's initial questionnaire requested that Ta Chen

report the unit cost of commissions paid to affiliated and

unaffiliated selling agents, and to describe the terms under

which commissions were paid and how commission rates were

determined.[19]  <u>Initial Questionnaire</u>, at C-20, Def.'s App., Tab

1, at 8.  Ta Chen responded that during the POR, it paid

commissions to only one unaffiliated party.[20]  <u>Response to</u>

<u>Initial Questionnaire</u>, at 48-49, Def.'s App., Tab 2, at 6-7.

---

[18]     [    ].

[19]     In order to calculate NV, the statute allows
Commerce to account for certain differences in the
circumstances of sales in the United States and foreign
markets.  <u>See</u> 19 U.S.C. § 1677b(a)(6)(C)(iii) (1994).
Pursuant to its regulations, Commerce makes circumstances of
sale adjustments for direct selling expenses, including
commissions.  <u>See</u> 19 C.F.R. § 351.410(b) & (c) (1999).

[20]     [    ]

Commerce's conclusion that Ta Chen misreported commissions stems from questions which Commerce officials asked Robert Shieh, president of Ta Chen and TCI, during verification at TCI in June 1997. In connection with questions regarding TCI's sales process, verification officials asked Mr. Shieh to "discuss his involvement in sales of . . . merchandise and the pricing methodology of TCI." Verification Report, at 5, Def.'s App., Tab 8, at 5. Mr. Shieh described his visits to various distributors during the POR, including one visit to one of Anderson Alloy's customers, Company C. The report goes on to state that:

> Mr. Shieh also clarified that prices between Anderson Alloys and [Company C] were negotiated by Anderson Alloys. In addition, he stated that there are times when Ta Chen has sold direct to [Company C]. During such instances, Ta Chen negotiated the price with [Company C]. Ta Chen would then pay Anderson Alloys a commission.

Id. There was no further discussion or elaboration of these sales at any point during verification.

In an internal memorandum, the case analyst stated that "newly-disclosed facts" were made at verification, pertaining to sales Ta Chen reported as being made to Anderson. "Ta Chen revealed for the first time that certain of these sales had, in fact, been made to yet another customer, [Company C], an entity which has never before been referenced in this

administrative review."  <u>Analysis Memorandum for Final Results

of 1994-1995 Ta Chen Review</u> (July 1, 1997), at 2, C.R. Doc.

32, Def.'s App., Tab 9, at 2.  This memorandum also

characterized Mr. Shieh's comments as a statement that

Anderson Alloys was a commissionaire on sales to Company C

during the POR.  <u>Id.</u>  The memorandum further stated:

> [Ta Chen] deliberately misreported an unknown portion of
> its sales to Anderson . . . .  Furthermore, Ta Chen
> stated affirmatively for the record that it paid
> commissions to one only U.S. commissionaire . . . .
> Prior to verification Ta Chen never indicated that it
> paid commissions to Anderson or to any other party, and
> Ta Chen's U.S. data do not reflect commission amounts on
> any of the sales Ta Chen identified as being to Anderson.
> Thus, Ta Chen failed not only to name Anderson as a
> commissionaire, but also failed to report the commissions
> it *did* pay to Anderson.

<u>Id.</u> at 3, Def.'s App., Tab 9, at 3 (emphasis in original).

After issuance of the <u>Final Results</u>, in which Commerce

applied adverse facts available to Ta Chen's sales to

Anderson, Ta Chen requested a correction of the Department's

treatment of these sales, claiming that the conclusion that Ta

Chen sold subject merchandise to Company C during the POR was

a ministerial error.  <u>Ministerial Error Submission</u> (July 24,

1997), at 4, C.R. Doc. 34, Pl.s' Prop. App., Tab P, at 4.[21]

---

[21]    The July 24, 1997 submission was a re-submission of
Ta Chen's July 17, 1997 submission alleging a ministerial
error.  Commerce determined that the July 17 submission
                                              (continued...)

Commerce did not, however, alter its conclusion that Ta Chen had misreported its sales to Anderson Alloys and failed to list Anderson as a commissionaire.

## Discussion

Ta Chen argues that the conclusion that it misreported sales to Anderson Alloys, and failed to list Anderson as a commissionaire during the POR, is not supported by substantial evidence.  Ta Chen insists that Mr. Shieh's comments regarding sales to Company C referred to sales made outside of the POR, and that Mr. Shieh was responding to questions regarding Ta Chen's sales history, not just sales during the POR.  The Domestic Interested Parties counter that the verification was carried out to verify Ta Chen's sales information during the POR, so Commerce could legitimately interpret Mr. Shieh's statements as referring to sales which occurred during the POR.

The court agrees with Ta Chen that Commerce's conclusion is not supported by substantial evidence.  As stated in the

---

[21](...continued)
contained new factual information, and therefore returned the document pursuant to 19 C.F.R. § 353.38(i) (1997).  Commerce Letter Ruling (July 22, 1997), at 1, P.R. Doc. 103, Def.'s App., Tab 11, at 1.  Ta Chen was permitted to resubmit its allegation of ministerial error without referencing the new information.  Id.

discussion section of Ta Chen's sales to Sun, substantial

evidence is "more than a mere scintilla.  It means such

relevant evidence as a reasonable mind might accept as

adequate to support a conclusion."  Universal Camera Corp.,

340 U.S. at 477.  The court does not substitute its own

judgment for that of Commerce, but the court will not defer to

a decision which is based on "inadequate analysis or

reasoning."  USX Corp. v. United States, 11 CIT 82, 88, 655 F.

Supp. 487, 492 (1987) (rejecting analysis of ITC where ITC did

not fully analyze the issue).  "[T]he absence of information

necessary for a thorough analysis may render a determination

unsupported by substantial evidence."  Id. at 95, 655 F. Supp.

at 498 (citation omitted).

    Commerce's analysis that Ta Chen misreported its sales to

Anderson is inadequate.  There is no indication from the

verification report that Commerce had any concerns regarding

Ta Chen sales to Company C with commissions to Anderson.  The

Final Results do not elaborate any reason why the discussion

at verification could justifiably lead to the conclusion that

Mr. Shieh was referring to POR sales of subject merchandise.

See Final Results, 62 Fed. Reg. at 37,544.

    Mr. Shieh's statement during verification was made in

response to questions regarding the history of Ta Chen's sales

process.  The introductory paragraph to this section of the verification report states that Ta Chen was to be "prepared to discuss the history of Ta Chen's efforts at selling pipe in the United States."  <u>Verification Report</u>, at 4, Def.'s App., Tab 8, at 4.  Mr. Shieh stated that "<u>there are times</u> when Ta Chen has sold direct to [Company C].  During such instances, Ta Chen negotiated the price with [Company C].  Ta Chen would then pay Anderson Alloys a commission."  <u>Id.</u> at 5, Def.'s App., Tab 8, at 5 (emphasis added).  This sole statement is not sufficient evidence for a conclusion that Ta Chen misreported its commissions when it was made in the context of Ta Chen's history of its sales in the United States, and where the verification report itself does not indicate that Mr. Shieh's statement was in any way problematic.

Ta Chen also emphasizes that it was provided with no opportunity to clarify Mr. Shieh's statement regarding sales to Company C.  Commerce argues that verification is not the time to submit new information.  <u>See</u> <u>Tatung Co. v. United States</u>, 18 CIT 1137, 1142 n.3 (1994) (court accepted as reasonable "Commerce's position that allowing respondents who failed verification to re-submit new data, and requiring Commerce to re-verify this information would impose an undue burden on Commerce.")<u>; see</u> <u>also</u> <u>Chinsung</u>, 13 CIT at 106, 705

F. Supp. at 601-02 (stating that respondent bears the burden of creating an adequate record).  Ta Chen, unlike the respondent in Tatung, did not fail verification.  Indeed the verification report reflects that the Department did not find discrepancies in TCI's information.  By comparison, the Department found "numerous errors and omissions" in the respondent's data during verification in Tatung.  Tatung, 18 CIT at 1138.

     As stated in the discussion of Ta Chen's affiliation with Sun, Commerce has an obligation to "put parties on notice as to the deficiencies in their responses."  Usinor Sacilor, 19 CIT at 745, 893 F. Supp. at 1142.  In Usinor, Commerce failed to give the plaintiffs notice that information was absent between the issuance of its preliminary and final results.  The court held that this rendered Commerce's determination unsupported by substantial evidence and otherwise contrary to law.  Id. at 745, 893 F. Supp. at 1141.  In this case, Commerce's determination in the Final Results that Ta Chen had misreported sales to Anderson was a total surprise to Ta Chen.  By failing to provide Ta Chen with an opportunity to comment on this allegation, Commerce based its conclusion on insufficient evidence and reasoning which the court will not uphold.

Given this record, the court concludes that the finding that Ta Chen misreported its sales to Anderson is not supported by substantial evidence. On remand, Commerce must either provide Ta Chen an opportunity to submit evidence on the purported sales to Company C, in order for the Department to make a determination as to whether these sales were made during the POR, or Commerce must disregard the issue of misreported sales and undisclosed commissions to Anderson.

**III. Application of adverse facts**

Ta Chen contests the Department's application of adverse facts available, pursuant to 19 U.S.C. § 1677e (1994). Commerce applied adverse facts available to Ta Chen's misreported sales, i.e., its sales to Sun and Anderson. Final Results, 62 Fed. Reg. at 37,553. It did not base Ta Chen's margin on total adverse facts available, as requested by the Domestic Interested Parties. Id. Rather, Commerce applied partial adverse facts.

The Department concluded that an adverse inference was warranted because "Ta Chen failed to provide the Department with a complete and reliable listing of its U.S. sales," and that this amounted to a failure on Ta Chen's part to cooperate to the best of its ability. Preliminary Results, 62 Fed. Reg. at 1,436. Commerce stated further in the Final Results that,

with regard to sales to Anderson, Ta Chen misreported these sales and failed to act to the best of its ability in this regard.  Final Results, 62 Fed. Reg. at 37,544.

The court need not resolve the issue of whether the application of adverse facts available was warranted, in light of the fact that it is remanding this case to provide Ta Chen an opportunity to provide the Department with information on Sun's US sales and on Ta Chen's sales to Anderson Alloys.[22] Commerce will therefore have to recalculate the dumping margin in light of this information and, depending on Ta Chen's cooperation on remand, may or may not find that an application of adverse facts available is warranted.

## IV.  Corroboration of the dumping margin

Commerce applied a 31.90 percent margin as partial adverse facts available to Ta Chen's sales to Sun and to Anderson.  This margin was the highest rate from the initial

---

[22]    The court also does not address Ta Chen's argument that the Department may not consider the respondent's level of cooperation in selecting substitute information when it applies partial adverse facts available.  Pl.'s Br. at 41. The court does note that it has upheld the application of adverse facts to only a portion of a respondent's data.  See Toyota Motor Sales, U.S.A., Inc. v. United States, 15 F. Supp.2d 872, 882 (Ct. Int'l Trade 1998); Ferro Union, 1999 WL 825584, at *7 (Ct. Int'l Trade Oct. 6, 1999) (application of partial adverse facts available furthered goal of accuracy while maintaining adversity).

LTFV investigation.  Preliminary Results, 62 Fed. Reg. at

1,436; see also Certain Welded Stainless Steel Pipe from

Taiwan, 57 Fed. Reg. at 62,301.  This resulted in a weighted-

average margin of 6.06 percent.  Final Results, 62 Fed. Reg.

at 37,556.

Ta Chen argues that Commerce failed to corroborate the

margin in accordance with 19 U.S.C. § 1677e(c).  In light of

the court's instructions to Commerce on remand, however, the

court need not determine whether the application of this

margin was warranted, nor whether it was properly

corroborated.  The court also does not address Ta Chen's

arguments that the margin was based on aberrant sales.

Commerce will calculate a margin for Ta Chen based on its

findings pursuant to this remand.

### Conclusion

The court affirms Commerce's finding that Ta Chen and Sun

Stainless are affiliated parties, as based on substantial

evidence.  Commerce erred, however, in applying facts

available.  On remand, Commerce will ask Ta Chen to provide

information on Sun's US sales.  The court also finds that

Commerce's decision that Ta Chen misreported its sales to

Anderson Alloys was not based on substantial evidence.  On

remand, Commerce will provide Ta Chen with an opportunity to

explain whether the alleged sales to Company C occurred outside of, or during, the POR, or will disregard this issue.

Remand results are due within 60 days.  Objections are due 20 days thereafter, responses 11 days thereafter.

_____
Jane A. Restani
JUDGE

Dated:    New York, New York

This 28th day of October, 1999